**STATE OF MICHIGAN**
**IN THE 36th DISTRI COURT**

**BRITE FINANCIAL SERVICES, LLC**, a
Michigan Limited Liability Company,

              Plaintiff,

v.

**BOBBY'S TOWING SERVICE, LLC**, a
Michigan Limited Liability Company *and*
**ROBERT L. HARDISON** *and* **DENISE
BOYCE-HARDISON**,

              Defendants.

Case No: 17-119492-GC

Hon. Izetta F. Bright

| | |
|---|---|
| **JASON MICHAEL KATZ, P.C.**<br>Jason M. Katz (P62923)<br>Robert E. Zielinski (P69250)<br>Attorneys for Plaintiff<br>30665 Northwestern Highway, Suite 202<br>Farmington Hills, MI 48334<br>(248) 702-6310<br>Fax: (248) 702-6311<br>jkatz@katz2law.com | **DELDIN LAW, PLLC**<br>Marc A. Deldin (P71041)<br>Attorney for Defendant Bobby's Towing<br>48 S. Main, Suite 3<br>Mount Clemens, MI 48043<br>(586) 741-8116<br>Fax: (586) 690-4130<br>marc@deldinlaw.com<br><br>**ROBERT L. HARDISON**<br>**DENISE BOYCE-HARDISON**<br>Co-Defendants<br>10807 Lyndon St.<br>Detroit, MI 48238 |

## PLAINTIFF'S AMENDED COMPLAINT

    **NOW COMES**, BRITE FINANCIAL SERVICES, LLC ("Plaintiff"), by and through

its attorneys, JASON MICHAEL KATZ, P.C., and for its Amended Complaint against

BOBBY'S TOWING SERVICE, LLC ("Bobby's Towing"), and ROBERT L. HARDISON

and DENISE BOYCE-HARDISON, states as follows:

## PARTIES AND JURISDICTION

    1.    Plaintiff is a Michigan limited liability company whose principal place of

business is in the City of Madison Heights, Oakland County, State of Michigan.

# EXHIBIT 3

2.      Defendant Bobby's Towing is a Michigan limited liability company with its principal place of business in the City of Detroit.

3.      Bobby's Towing is currently not in good standing with the State of Michigan.

4.      Robert L. Hardison is a co-owner of Bobby's Towing, doing business in the City of Detroit.

5.      Denise Boyce-Hardison is a co-owner of Bobby's Towing, doing business in the City of Detroit.

6.      On information and belief, the property at issue is located in the Wayne County.

7.      The facts that created the causes of action set forth herein occurred in Wayne County.

8.      Plaintiff seeks damages exceeding $25,000.00.

9.      Given the damages now claimed, the case should be transferred to Circuit Court. Plaintiff will stipulate to a transfer or concur with a motion to transfer.

## GENERAL ALLEGATIONS

10. Plaintiff is the titled owner of a 2013 Chevrolet Malibu, VIN 1G11C5SA1DF228194 (the "Vehicle").  A copy of the Plaintiff's title to the Vehicle is attached. **Exhibit 1 – Certificate of Title**.

11. The Vehicle has a present retail value between $10,000.00 and $13,000.00. **Exhibit 2 – Manheim Market Report, 7/31/2017**.

# EXHIBIT 3

12. The Vehicle was leased by Plaintiff to Lessees Daylan Lett and Sonya Watkins (the "Lessees") pursuant to a Closed End Vehicle Lease Agreement, a copy of which is attached. **Exhibit 3 – Lease Agreement**.

13. Pursuant to the Vehicle lease, Lessees were paying Plaintiff monthly installments.

14. On information and belief, at all relevant times, Bobby's Towing has been under contract with the City of Detroit to provide towing services for the city, including towing services generated from a request by the Detroit Police Department. **Exhibit 4 – Professional Service Contract, contract #2892161**.

15. Pursuant to Bobby's Towing contract with the City of Detroit (Exhibit 4):

   a.  The contract only pertained to "abandoned" vehicles;

   b.  The contract expired on June 30, 2017;

   c.  Bobby's Towing was to "comply with and shall require its Associates to comply with all applicable federal, state and local laws." (Ex. 4, pg. 21);

   d.  Bobby's Towing was required to tow all vehicles to only impound lots owned by the City of Detroit. (Ex. 4, Scope of Services);

   e.  Bobby's Towing could only charge the City of Detroit a flat towing fee of $125.00 (Ex. 4, Scope of Services)

16. On information and belief, on or about June 19, 2017, the Detroit Police Department ("DPD"), pursuant to Exhibit 4, generated a request that directed Bobby's Towing to tow the Vehicle.

# EXHIBIT 3

17. On or about June 19, 2017, due to the DPD's seizure of the Vehicle, the Lessees became dispossessed of the Vehicle and the Vehicle came into the custody and possession of all Defendants.

18. On information and belief, <u>DPD did not</u>:

    a.  Put any hold on the Vehicle;

    b.  Consider the Vehicle stolen;

    c.  Consider the Vehicle scrap;

    d.  Consider the Vehicle evidence of a crime.

19. On information and belief, the Vehicle was towed to real property owned and operated by Bobby's Towing and/or Robert L. Hardison and/or Denise Boyce-Hardison.

20. Subsequent to Defendants taking possession of the Vehicle, the Lessees attempted to redeem and reclaim the Vehicle from Defendants. However, Defendants refused to return the Vehicle to the Lessees.

21. Since learning on June 20, 2017 that the Vehicle is in the possession of the Defendants, Plaintiff has presented ownership documents to the Defendants and has demanded numerous times that the Vehicle be returned to Plaintiff.  Despite Plaintiff's numerous efforts, Defendants have refused to return the Vehicle to Plaintiff. **<u>Exhibit 5</u> – Affidavit of Plaintiff.**

22. On information and belief, the Defendants remain in possession of the Vehicle and the Vehicle is currently stored upon real property owned and operated by Bobby's Towing and/or Robert L. Hardison and/or Denise Boyce-Hardison.

23. The Vehicle was never abandoned.

# EXHIBIT 3

## COUNT ONE – STATUTORY CONVERSION

24. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-23 of this Amended Complaint.

25. By way of their illegal retention of the Vehicle, Defendants have intentionally exercised dominion and control over property that does not belong to them and rightfully belongs to the Plaintiff.

26. Defendants have wrongfully converted the Vehicle to their own use and are required to reimburse Plaintiff for same.

27. Pursuant to MCL 600.2919a, Plaintiff is entitled to treble damages as a result of the wrongful conversion by Defendants, as well as Plaintiff's taxable costs and actual attorney fees.

28. As a result of the actions of Defendants, Plaintiff has sustained damages exceeding $25,000.00.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter Judgment against the Defendants in an amount exceeding $25,000.00, together with an award of costs and attorney fees in addition to any equitable relief that is just and proper.

## COUNT TWO – COMMON LAW CONVERSION

29. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-28 of this Amended Complaint.

30. Plaintiff, at all relevant times, was the rightful and legal owner of the Vehicle.

31. Despite Defendants' full awareness of Plaintiff's rightful ownership of the Vehicle, Defendants have refused to return same to Plaintiff.

# EXHIBIT 3

32. Plaintiff never authorized Defendants to possess and/or retain the Vehicle, including for Defendant's own benefit.

33. Given the refusal of the Defendants to return the Vehicle to Plaintiff, Plaintiff asserts that the Defendants intend to retain the vehicle and therefore possess the Vehicle for their own use and benefit, and/or convert the Vehicle for pecuniary gain.

34. Defendants obtained possession of the Vehicle without Plaintiff's knowledge or authority.

35. By their actions, Defendants have stolen, embezzled, or converted the Vehicle for their own use and benefit.

36. As a result of the actions of Defendants, Plaintiff has sustained actual damages exceeding $25,000.00.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter Judgment against the Defendants in an amount exceeding $25,000.00, together with an award of costs and attorney fees in addition to any equitable relief that is just and proper.

## COUNT THREE - TORTIOUS INTERFERENCE
### WITH A BUSINESS RELATIONSHIP OR EXPECTANCY

37. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-36 of this Amended Complaint.

38. The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and

# EXHIBIT 3

resultant damage to the plaintiff. *BPS Clinical Laboratories v Blue Cross & Blue Shield of Michigan*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996).

39. At the time Defendants took possession of the Vehicle, Plaintiff and the Lessees were in a business relationship via the existence of a binding contract, *i.e.* a Closed End Vehicle Lease Agreement, a copy of which is attached. **Exhibit 3 – Lease Agreement**.

40. Pursuant to the lease agreement, the Lessees were making monthly installment payments to the Plaintiff. Plaintiff expected monthly payments from the Lessees to continue for the duration of the lease.

41. On or about June 20, 2017, if not earlier, Defendants knew that Plaintiff was the lessor of the Vehicle and that an active lease agreement existed for the Vehicle.

42. Despite Plaintiff's proofs of ownership and numerous demands for the return of the Vehicle, Defendants intentionally interfered with the lease agreement between Plaintiff and the Lessees by denying the Plaintiff and the Lessees the return of the Vehicle.

43. The actions of the Defendants caused a breach of Plaintiff's contract with the Lessees and Plaintiff has been damaged as a result of the breach.

44. Due to Defendant's continued unlawful possession of the vehicle, the Lessees have ceased submitting payments to the Plaintiff and a significant balance remains due and owing on the lease.

45. At the time Defendants took possession of the Vehicle, Lessees were current with their monthly payments to Plaintiff pursuant to the Vehicle lease.

# EXHIBIT 3

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter Judgment against the Defendants in an amount exceeding $25,000.00, together with an award of costs and attorney fees in addition to any equitable relief that is just and proper.

### COUNT FOUR – UNJUST ENRICHMENT (QUANTUM MERUIT)

46. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-45 of this Amended Complaint.

47. The elements for a claim of unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) inequity resulting to plaintiff from defendant's retention of the benefit. *Barber v SMH (US), Inc*, 202 Mich App 366, 375; 509 NW2d 791 (1993).

48. By acquiring and retaining the Vehicle, and the Vehicle having a monetary value, Defendants have received a benefit.

49. By the actions of Defendants, Plaintiff has been deprived of the benefit of continued payments from the Lessees.

50. Due to the actions of Defendants, an inequity has resulted and Defendants have been unjustly enriched.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter Judgment against the Defendants in an amount exceeding $25,000.00, together with an award of costs and attorney fees in addition to any equitable relief that is just and proper.

# EXHIBIT 3

## COUNT FIVE – ABUSE OF PROCESS

51. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-50 of this Amended Complaint.

52. The essential elements of an action for abuse of process are (1) the existence of an ulterior purpose and (2) an act in the use of the process not proper in the regular conduct or prosecution of the case. *Rowbotham v DAIIE,* 69 Mich App 142, 147; 244 NW2d 389 (1976), citing *Spear v Pendill,* 164 Mich 620; 130 NW 343 (1911).

53. The dominant and ulterior purpose of Defendants was to transfer the Vehicle to their own lot and lengthen the amount of time the Vehicle was in their possession so that Defendants could accrue additional per diem storage fees to inevitably demand Plaintiff to pay to redeem the Vehicle, in addition to charging Plaintiff an elevated towing fee above and beyond the rate billed to the City of Detroit, or in the alternative, to acquire title to abandoned vehicles to auction them for monetary gain.

54. By way of Bobby's Towing contract with the City of Detroit, and by operating under and utilizing MCL 257.252, Defendants subverted the abandoned vehicle statute and its procedural rules and thereby caused harm to Plaintiff by:

   a.  Towing the Vehicle to a lot other than one owned by the City of Detroit;

   b.  Towing the Vehicle despite the Vehicle not being deemed or classified  as abandoned pursuant to 257.252a;

   c.  Misstating the law to the Lessees and Plaintiff when they respectively attempted to redeem the Vehicle;

   d.  Charging Plaintiff illegal and unreasonable fees;

# EXHIBIT 3

e. Reporting the Vehicle as abandoned to the State of Michigan and/or the DPD after Plaintiff presented documentation establishing Plaintiff's ownership of the Vehicle;

f. Reporting the Vehicle as abandoned to the State of Michigan and/or the DPD after Plaintiff filed and served the instant lawsuit.

55. Defendant's improper use of process of the abandoned vehicle definitions, rules, and procedures set forth in MCL 257.252 *et. seq.* is for a purpose outside of the intended purpose codified in the Act's substantive and procedural content, including but not limited to, its due process provisions.

56. The willful actions of Defendants alleged herein corroborate their dominant and ulterior motive to inflate fees and extort vehicle owners and Lessees into paying said fees.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter Judgment against the Defendants in an amount exceeding $25,000.00, together with an award of costs and attorney fees in addition to any equitable relief that is just and proper.

## COUNT SIX – VIOLATION OF 42 U.S.C. 1983

57. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-56 of this Amended Complaint.

58. For a claim under 42 U.S.C. 1983, a plaintiff must allege (1) that some person has deprived him or her of a federal right and (2) that the person who has deprived him or her of that right acted under color of state or territorial law. *Gomez v Toledo*, 446 US 635, 640 (1980).

# EXHIBIT 3

59. Being the title owner of the Vehicle, by way of the Fourteenth Amendment of the United States Constitution, Plaintiff has a federal right of ownership and possession of the Vehicle.

60. By the actions set forth in this Amended Complaint, Defendants were acting under color of law in the following ways:

    a.  Seizing the Vehicle pursuant to a contract with the City of Detroit;

    b.  Seizing the Vehicle at the request of the DPD and/or the City of Detroit's Municipal Parking Department;

    c.  Seizing the Vehicle as an agent and/or contractor and/or official of the City of Detroit and/or the Detroit Police Department.

61. By the improper and illegal actions of Defendants as set forth in this Amended Complaint, Plaintiff was deprived of its federal right to property, *i.e.* possession of the Vehicle at issue.

62. As a result of the improper and illegal actions of Defendants as set forth in this Amended Complaint, Plaintiff has sustained damages and incurred attorney fees.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter Judgment against the Defendants in an amount exceeding $25,000.00, together with an award of costs and attorney fees in addition to any equitable relief that is just and proper.

PROOF OF SERVICE
The undersigned certifies that the foregoing instrument was served upon all parties to the above cause by depositing a copy thereof in the U.S. Mail postage prepaid, in envelopes addressed to the parties of record or the attorneys of record herein at their respective addresses disclosed on the pleadings, on 10-13 , 20 17 .

Respectfully submitted,

Jason M. Katz (P62923)
Robert E. Zielinski (P69250)
Attorneys for Plaintiff

Dated: October 13, 2017

# EXHIBIT 3

Exhibit    1

**EXHIBIT 3**

# STATE OF MICHIGAN

## CERTIFICATE OF TITLE

16071116

| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE | MODEL | | BODY STYLE |
|---|---|---|---|---|---|
| 1G11C5SA1DF228194 | 2013 | CHEVROLET | MALIBU | | FOUR DOOR |

| TITLE NUMBER | ISSUE DATE | ODOMETER | | BRAND/LEGEND |
|---|---|---|---|---|
| 603E3022744 TS | 10/31/2016 | 056800 | | |

WEIGHT/FEE CATEGORY
23

ODOMETER BRAND
*ACTUAL MILEAGE*

OWNER(S) NAME AND ADDRESS :
BRITE FINANCIAL SERVICES LSR DAYLAN
M LETT & SONYA A WATKINS LSE
14021 VERNON ST
OAK PARK MI 48237

First Secured Party
BRITE FINANCIAL SERVICES
101 W 14 MILE
MADISON HEIGHTS       MI       48071

Filing Date
10-24-2016

Release of First Lien:

X _____
Signature of Agent       Date

## Title Assignment by Seller

State and federal laws require the seller(s) to indicate mileage when ownership is transferred. Failure to complete or providing false information may result in civil liability, fines and/or imprisonment. ANY ALTERATION, ERASURE, FALSE STATEMENT, FORGERY OR FRAUD VOIDS THIS TITLE AND IS A CRIME.

I warrant that the ownership of the vehicle described on Certificate of Title has been transferred to the following purchaser(s) and is free of all previous liens:

| Printed Name of Purchaser(s) | | Date of Sale | Selling Price |
|---|---|---|---|
| Purchaser's Street Address | City | State | Zip |

I (we) certify that the odometer reading is: ☐☐☐☐☐☐ ⊠ and that to the best of my knowledge the odometer mileage is:
(No Tenths)
☐ actual mileage ☐ not actual mileage - WARNING ODOMETER DISCREPANCY ☐ exceeds mechanical limits of odometer (odometer has rolled over)

X _____
Signature of Seller(s)        Printed Name of Seller(s)

| Seller's Street Address | City | State | Zip |
|---|---|---|---|

A $15.00 Late Fee is Due for Failure to Apply for Title Within 15 Calendar Days of Date of Assignment
"I am aware of the above odometer certification made by the seller(s)."

X _____
Signature of Purchaser(s)        Printed Name of Purchaser(s)

NEW LIENHOLDER INFORMATION: The information below must be on an application for title and presented to the Michigan Department of State.

| Secured Party: | Address: |
|---|---|

The State of Michigan, Michigan Department of State certifies that this certificate of title is issued in compliance with the laws of Michigan and constitutes prima facie proof of ownership. Further, on the date of title issuance, the described vehicle was subject to the security interest(s) listed above.

MAILING ADDRESS

BRITE FINANCIAL SERVICES
101 W 14 MILE RD
MADISON HEIGHTS MI 48071

G87057882

**NOTICE TO SELLERS**
Sellers must keep a receipt or photocopy of the reassigned title for their records for 18 months or accompany the purchaser to a Secretary of State Office.

DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS OR MUTILATIONS

# EXHIBIT 3

Exhibit  2

**EXHIBIT 3**

7/31/2017                    Manheim | MMR | CHEVROLET MALIBU | July 31, 2017 US Edition

 **MANHEIM MARKET REPORT** July 31, 2017 US Edition

## 2013 CHEVROLET MALIBU 4D SEDAN LT
1G11C5SA1DF228194

## MMR



| BASE | ADJUSTMENTS | ADJUSTED |
|---|---|---|
| **$7,325** | Odometer<br>-- | **$7,325** |
| Avg Odo (mi) **77,216**  Avg Cond **2.8** | Region<br>-- | $7,325 |
| | Grade<br>-- | $5,325            $9,325 |
| Typical Range<br>**$5,325 - $9,325** | Ext Color<br>**Silver \| $0**<br>Numbers may not add exactly due to rounding | |

### Transactions    Showing 25 of 100                                          ▼ Filter    🖶 Export

| Date ▾ | Price | Odo (mi) | Cond | Eng/T | Ext Color | Type | Region | Auction |
|---|---|---|---|---|---|---|---|---|
| 7/28/17 | $4,500 | 104,096 | 1.4 | 4G/A | Black | Regular | Southeast | Fort Lauderdale |
| 7/28/17 | $6,400 | 94,214 | -- | 4G/A | Silver | Regular | Southwest | Dallas |
| 7/27/17 | $10,000 | 59,998 | 3.6 | 4G/A | Gray | Regular | Southeast | Tampa |
| 7/27/17 | $7,300 | 81,034 | 2.4 | 4G/A | Gray | Lease | West Coast | Central California |
| 7/27/17 | $8,300 | 81,295 | -- | 4G/A | White | Regular | West Coast | Phoenix |
| 7/27/17 | $7,900 | 65,443 | 3.6 | 4G/A | White | Lease | Midwest | Detroit |
| 7/27/17 | $9,100 | 35,496 | 2.5 | 4G/A | Gray | Lease | Midwest | Chicago |
| 7/27/17 | $7,000 | 42,674 | -- | 4G/A | Gray | Regular | Midwest | Chicago |
| 7/27/17 | $5,800 | 97,796 | 2.7 | 4G/A | White | Lease | Midwest | Louisville |
| 7/27/17 | $9,000 | 75,757 | -- | 4G/A | Gray | Regular | Northeast | Albany |
| 7/27/17 | $4,400 | 123,074 | 1.7 | 4G/A | Black | Lease | Southeast | Darlington |
| 7/27/17 | $5,700 | 101,027 | 4.4 | 4G/A | Silver | Lease | Southeast | Jacksonville |
| 7/26/17 | $6,800 | 75,968 | 1.8 | 4G/A | Blue | Lease | Southeast | New Orleans |
| 7/26/17 | $7,500 | 88,346 | 2.3 | 4G/A | Silver | Lease | West Coast | California |
| 7/26/17 | $5,000 | 122,114 | 2.5 | 4G/A | White | Lease | Southwest | Dallas |
| 7/26/17 | $9,000 | 73,763 | 2.6 | 4G/A | Silver | Regular | Southwest | Dallas |
| 7/26/17 | $9,700 | 64,334 | 3.5 | 4G/A | Black | Lease | Southwest | San Antonio |
| 7/26/17 | $7,800 | 76,171 | -- | 4G/A | Silver | Regular | Southwest | San Antonio |

# EXHIBIT 3

7/31/2017                    Manheim | MMR | CHEVROLET MALIBU | July 31, 2017 US Edition

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 7/26/17 | $7,200 | 71,417 | 1.7 | 4G/A | Silver | Lease | Midwest | Milwaukee |
| 7/26/17 | $5,200 | 110,000 | 2.6 | 4G/A | White | Lease | Midwest | Milwaukee |
| 7/26/17 | $5,300 | 123,155 | 3.5 | 4G/A | Gray | Lease | Northeast | Pittsburgh |
| 7/26/17 | $9,300 | 68,899 | - - | 4G/A | Gray | Regular | Northeast | Pittsburgh |
| 7/26/17 | $9,700 | 38,162 | 2.9 | 4G/A | Blue | Regular | Northeast | New York |
| 7/25/17 | $5,100 | 94,500 | - - | 4G/A | Silver | Regular | Southeast | Birmingham |
| 7/25/17 | $8,800 | 76,455 | 4.2 | 4G/A | Gray | Regular | West Coast | Riverside |

Showing 25 of 100
* Transactions not in sample

## Historical Average

| Past 30 Days | 6 Months Ago | Last Year |
|---|---|---|
| $7,525 | $8,825 | $10,650 |
| 77,216 mi | 66,333 mi | 52,355 mi |

## Projected Average

Next Month
$7,325

## Estimated Retail Value
Based on Advertised Retail Prices

# $11,850

Typical Range
$10,550 - $13,150

# EXHIBIT 3

Exhibit  3

**EXHIBIT 3**

# br;te

**CLOSED END VEHICLE LEASE AGREEMENT**

(Assigned to Brite Financial Services, LLC)

Lease Date: __10/28/16__

This lease agreement ("Lease") is between the lessor and the lessees listed below. In this Lease the words "I", "me," or "my" refer to the lessee(s). The words "you" or "your" refer to the lessor and "we," "our" or "us" refer to both the lessee(s) and lessor. I understand that the Consumer Leasing Act Disclosures made in this Lease are also made on behalf of Brite Financial Services, LLC ("Brite Financial") to whom you will assign this Lease. In this Lease, "e" means an estimate. The Consumer Leasing Act Disclosures shown below are also terms of this Lease.

Lease Name(s) DAYLAN M LETT SONYA WATKINS    Address(es) 14021 VERNON OAK PARK, MI 48237

**1. AGREEMENT TO LEASE.** I will lease the vehicle described below ("Vehicle") under this Lease. Our obligations begin when we have signed this Lease. If the Vehicle is not delivered to me when we sign, you will use your best efforts to deliver it to me as soon as reasonably possible. The Lease lasts for _104_ BIWEEKLIES and the end of the Lease term is 10/23/2020 ("Lease Term").

Description of Leased Vehicle

| New or Used | Year | Make | Model | Body Style | Color | Vehicle Identification Number | Odometer |
|---|---|---|---|---|---|---|---|
| USED | 2013 | CHEVROLET | MALIBU | LT SEDAN 4D | SILVER | 1G11C5SA1DF228194 | 56800 |
| Trade: | N/A | Year   N/A | Make | N/A | | Model   N/A | Vin |

**2. FEDERAL CONSUMER LEASING ACT DISCLOSURES.**

| A. Amount Due at Lease Signing or Delivery (Itemized below)* $ 1,500.01 | B. Periodic Payments My first periodic BIWEEKLY payment of $ 226.36 is due on 10/28/16, followed by 103 periodic payments of $ 226.36 due on 10/27/2016 of each BIWEEK. The total of my periodic payments is $ 23,541.44. | C. Other Charges (not part of my periodic payment) Disposition Fee (if I do not purchase the Vehicle and the fee is not waived under Paragraph 33) | D. Total of Payments (The amount I will have paid by the end of the Lease) $ 24,190.09 (A + B + C Totals − E(3) − E(4)) |
|---|---|---|---|

| | | | $450.00 |
|---|---|---|---|
| | | N/A | N/A |
| | | Total | $450.00 |

*Itemization of Amount Due at Lease Signing or Delivery*

| E. Amount Due at Lease Signing or Delivery: | | F. How the Amount Due at Lease Signing or Delivery will be paid: | |
|---|---|---|---|
| (1) Capitalized Cost Reduction | $ 123.25 | (1) Net Trade-In Allowance | $ N/A |
| (2) Tax on Capitalized Cost Reduction | $ 7.40 | (2) Rebates and Noncash Credits | $ N/A |
| (3) First Periodic Payment | $ 226.36 | (3) Amounts to Be Paid in Cash | $ 1,500.01 |
| (4) Refundable Security Deposit | $ 1,000.00 | (4) Total | $ 1,500.01 |
| (5) Registration/License Fees | $ 128.00 | | |
| (6) Title Fees | $ 15.00 | | |
| (7) N/A | $ N/A | | |
| (8) N/A | $ N/A | | |
| (9) Total | $ 1,500.01 | | |

**G My Periodic Payment is Determined as Shown Below:**

| | | | |
|---|---|---|---|
| (1) | Gross Capitalized Cost. The agreed upon value of the Vehicle ($ 13,488.00 ) and any items I pay over the Lease Term (such as service contracts, insurance, and any outstanding prior credit or lease balance) (itemized below) | | $ 16,458.00 |
| (2) | Capitalized Cost Reduction. The amount of any net trade-in allowance, rebate, noncash credit or cash I pay that reduces the gross capitalized cost | − | $ 123.25 |
| (3) | Adjusted Capitalized Cost. The amount used in calculating my base periodic payment | = | $ 16,334.75 |
| (4) | Residual Value. The value of the Vehicle at the end of the Lease Term used in calculating my base periodic payment | − | $ 4,585.92 |
| (5) | Depreciation and any Amortized Amounts. The amount charged for the Vehicle's decline in value through normal use and for other items paid over the Lease Term | = | $ 11,748.83 |
| (6) | Rent Charge. The amount charged in addition to the depreciation and amortized amounts | + | $ 10,460.37(e) |
| (7) | Total of Base Periodic Payments. The depreciation and amortized amounts plus the rent charge | = | $ 22,209.20 |
| (8) | Lease Payments. The number of payments in my Lease | ÷ | $ 104 |
| (9) | Base Periodic Payment | = | $ 213.55 |
| (10) | Periodic Sales/Use Tax | + | $ 12.81(e) |
| (11) | Total Periodic Payment | = | $ 226.36 |

**H.** Early Termination. I may have to pay a substantial charge if I end this Lease early. The charge may be up to several thousand dollars. The actual charge will depend on when the Lease is terminated. The earlier I end the Lease, the greater this charge is likely to be.

**I.** Excessive Wear and Use. I may be charged for excessive wear based on your standards for normal use and for mileage in excess of _18000_ miles per year ("Mileage") at the rate of $0. _16_ per mile.

**J.** Purchase Option at End of Lease Term. I have an option to purchase the Vehicle at the end of the Lease Term for $ _4,585.92_. The purchase option price does not include official fees such as those for taxes, tags, licenses and registration.

**K.** Other Important Terms. See the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, and insurance.

LESSEE(S) INITIALS _____

BRITE Michigan 7/2016

Page 1 of 10

# EXHIBIT 3

| | Itemization of Gross Capitalized Cost | | |
|---|---|---|---|
| (a) | Agreed upon value of Vehicle as equipped............................................................... | $ | 13,488.00 |
| (b) | Acquisition fee............................................................................................................. | $ | 595.00 |
| (c) | Documentary/service fee............................................................................................. | $ | 210.00 |
| (d) | Prior credit or lease balance....................................................................................... | $ | N/A |
| (e) | License fee................................................................................................................... | $ | N/A |
| (f) | Title and registration fee............................................................................................ | $ | 24.00 |
| (g) | Taxes............................................................................................................................ | $ | N/A |
| (h) | Southwest Re _____ | $ | 1,500.00 |
| (i) | N/A _____ | $ | N/A |
| (j) | N/A _____ | $ | N/A |
| (k) | N/A _____ | $ | N/A |
| (l) | GAP _____ | $ | 641.00 |
| (m) | N/A _____ | $ | N/A |
| (n) | Total Gross Capitalized Cost:..................................................................................... | $ | 16458 |

### OTHER FINANCIAL DISCLOSURES

**3. ESTIMATED OFFICIAL FEES AND TAXES.** The total amount I will pay for official and license fees, registration, title, and taxes over the Lease Term, whether included in my periodic payment or assessed otherwise: $ 1,716.64 (e). The total fees and taxes I pay may be different than this estimate based on changes in the tax or fee rates and the value of the Vehicle when the fee or tax is determined.

**4. OPTIONAL SERVICE CONTRACT.** While I am not required to do so, I may choose to purchase from you an optional service contract under which I will have coverage for Vehicle-related expenses described in a separate service contract. Covered expenses will be paid by the administrator listed below on behalf of the service provider.

This protection will last _____ 36 _____ months from the date of this Lease or until the Vehicle has been driven _____ 36000 _____ miles, whichever occurs first.

Service Contract Administrator: Southwest Re _____

Choice of Payment:

I choose to purchase this service contract for its cash price of $ _____ N/A _____ . If I choose this option, the cash price of the service contract will be shown in Paragraph 2.E.(7) above.

LESSEE(S) INITIALS: (_____)(_____)

I choose to purchase this service contract and pay for its cash price of $ _____ 1,500.00 _____ over the Lease Term as part of my periodic payments. If I choose this option, the cash price of the service contract will be added to the gross capitalized cost in Paragraph 2.G.(1).

LESSEE(S) INITIALS: (_____)(_____)

**5. OPTIONAL GUARANTEED ASSET PROTECTION ("GAP") WAIVER.** While I am not required to do so, I may choose to purchase from you an optional GAP waiver ("GAP Waiver") under which you will waive some or all of the GAP amount I would owe as part of my liability under Paragraph 20 if the Lease is terminated after Total Loss. The "GAP amount" is the difference between the Lease Balance described in Paragraph 6 and the actual cash value of the Vehicle as defined in the GAP Waiver Agreement. If I purchase an optional GAP Waiver, my GAP Waiver Agreement provides the terms and conditions of this waiver.

GAP Administrator: BRite Gap _____

Choice of Payment:

I choose to purchase this GAP Waiver for its cash price of $ _____ N/A _____ . The cash price of the GAP Waiver will be shown in Paragraph 2.E.(8) above.

LESSEE(S) INITIALS: (_____)(_____)

I choose to purchase this GAP Waiver and pay for its cash price of $ _____ 641.00 _____ over the Lease Term as part of my periodic payments. If I choose this option, the cash price of the GAP Waiver will be added to the gross capitalized cost in Paragraph 2.G.(1).

LESSEE(S) INITIALS: (_____)(_____)

LESSEE(S) INITIALS (_____)(_____)

# EXHIBIT 3

6.  **LEASE BALANCE CALCULATION.** In Paragraphs 5, 18, 19 and 20 the term "Lease Balance" is used to describe a component of my potential liability on early termination or if I purchase the Vehicle. The Lease Balance equals the difference between the Adjusted Capitalized Cost (Paragraph 2.G.(3)) and all the depreciation and amortized amounts in the Base Periodic Payments (Paragraph 2.G.(9)) that have become due. You credit each Base Periodic Payment that becomes due first to the rent charge for that payment period and then to depreciation and any amortized amounts. The part of the Base Periodic Payment you credit to depreciation and any amortized amounts is deducted from the Lease Balance at the beginning of the payment period to compute the Lease Balance for the next payment period. Although my Base Periodic Payment does not change, the allocation of my Base Periodic Payment between the rent charge and depreciation and any amortized amounts is different each payment period. You use the "Constant Yield Method" to compute the rent charge portion of each Base Periodic Payment. Under this method, the rent charge portion of each Base Periodic Payment is computed by multiplying the constant rate implicit in this Lease times the "Rent Charge Balance." For each payment period, the "Rent Charge Balance" is the Lease Balance at the beginning of that payment period minus any Base Periodic Payment paid at Lease signing or delivery. For example, the rent charge portion of the Base Periodic Payment for the 1st payment period is figured by (A) computing the difference between the Adjusted Capitalized Cost, and any Base Periodic Payment paid at Lease signing or delivery and (B) multiplying that difference by the constant rate implicit in this Lease. This rent charge is deducted from my 1st Base Periodic Payment to compute the amount of the 1st Base Periodic Payment you credit to depreciation and any amortized amounts. This credit to depreciation and any amortized amounts is deducted from the Adjusted Capitalized Cost to compute the Lease Balance for the 2nd payment period. The scheduled due date of each periodic payment is the first day of the period to which the payment relates and the rent charge component of each payment is earned in full at the beginning of that payment period. You calculate the rent charge for each payment period based on the assumption that you receive each payment on its exact due date and that the Lease goes to full term. The constant rate implicit in this Lease is the rate that would yield the total rent charge disclosed in Paragraph 2.G.(6) assuming all my payments are received on their due dates and a 365 day year.

7.  **RETURNED PAYMENTS AND UNPAID FINES AND FEES.** I agree to pay a returned payment charge of $15.00 for any payment that is returned unpaid for any reason, to the extent the law allows it. If I don't pay a fine, penalty, toll or parking ticket and you choose to pay it, I will reimburse you for the amount paid plus a $ 15 Administrative Fee per incident, to the extent the law allows it.

*WARNING:  IF THE VEHICLE IS EQUIPPED WITH A STARTER INTERRUPT SYSTEM, THE VEHICLE MAY BE MADE INOPERABLE IF I DEFAULT UNDER THE LEASE. I WILL RECEIVE A SEPARATE DISCLOSURE IF A STARTER INTERRUPT SYSTEM IS INSTALLED IN THE VEHICLE.*

### MY OTHER OBLIGATIONS DURING THE LEASE TERM

8.  **LATE CHARGE OR LATE RETURN.** If any lease payment is not received by you within 10 days of its due date, I will pay you a late charge of $5.00, or such lesser amount as may be set by law. If for any reason the Vehicle is not returned to you at the scheduled end of the Lease Term, I will pay you an additional lease payment for any part of a payment period the Vehicle is retained after the scheduled end of the Lease Term. I acknowledge, however, that I have no right to retain the Vehicle after the end of the Lease Term and that any retention of the Vehicle after the end of the Lease Term is a default under this Lease.

9.  **INSURANCE.** I will provide insurance covering liability from operation of the Vehicle and covering loss and damage to the Vehicle during the Lease Term and until I return the Vehicle to you, as described below. I appoint you my attorney-in-fact to negotiate and settle, and endorse all checks for payments of, any amounts due under the insurance I am carrying under or in connection with this Lease. I will furnish you with a copy of my insurance policies or other reasonable written proof of the required coverages if and when you request it. I may obtain and maintain this required insurance from an insurer of my choice that is authorized to do business in the state in which the Vehicle is garaged (subject to your right to reject that insurer for reasonable cause).

**Liability Insurance:**

I will obtain and maintain minimum public liability insurance for bodily injury or death and minimum property damage insurance, as each are mandated in the state in which the Vehicle is garaged. I will ensure you are designated as an "additional insured" with respect to these coverages.

If checked ☒ I am being provided this Liability insurance coverage under a policy obtained by you and covering us for the first 10 days of this Lease without additional charge to me. After the first 10 days, I must obtain and maintain my own insurance to satisfy the above liability insurance requirements. No Liability Insurance Coverage is included in this Lease unless this box is checked and even if this box is checked, no liability coverage is provided after the first 10 days.

**Physical damage to the Vehicle:**

I will obtain and maintain physical damage insurance designating you as "loss payee" or "additional insured" that complies with the requirements in this Paragraph. The physical damage insurance I obtain must provide the following coverages: (i) Fire, theft and comprehensive insurance with a maximum deductible of $1,500; and (ii) collision insurance with a maximum deductible of $1,500. Any insurance policy I obtain must provide that I am a "named insured", be approved by you and must state you will be given at least 10 days advance written notice of any cancellation or change in coverage.

**Failure to obtain or maintain physical damage insurance; my reimbursement to you for CPI costs:**

If I fail to obtain and give you evidence of the required physical damage insurance within the first 30 days or if the physical damage insurance I have obtained for the Vehicle lapses or terminates, I will reimburse you upon your demand for the cost of collateral protection insurance ("CPI") that you may choose (but are not required) to purchase to protect your interest in the Vehicle. My charge for such CPI will equal the premium you pay for such CPI coverage prorated over the Lease Term. I understand that my CPI premiums may increase during the Lease Term, but the maximum rate I may be required to pay for CPI is $150 per month. I realize the CPI protects only your interest and will cover repair costs, less the deductible, in case of an accident where the Lease is not terminated. CPI will not cover confiscation or forfeiture of the Vehicle by any governmental authority, or theft, concealment or embezzlement of the Vehicle by me or my agent and contains certain other standard insurance policy exclusions. If, at any time, the Vehicle is worth more than the Lease Balance, this equity will not be insured. I also understand that your CPI coverage will contain a deductible of $1,000 for both physical damage and for a total casualty where the Lease is terminated under Paragraph 20. In connection with a Lease termination, the CPI coverage is limited, before application of the deductible, to the lesser of the Lease Balance or the then Vehicle value (which will likely be less than the Lease Balance). In either case, any additional amounts that may be due under the Lease beyond the Lease Balance are not covered. More details regarding how CPI works if the Vehicle is damaged or becomes a "Total Loss" are described in Paragraph 20. If my Vehicle is insured under CPI, at any time I may obtain the required physical damage insurance described above and the CPI coverage on my Vehicle will be canceled when I give you proof of this insurance. If required by law, upon providing you with proof of insurance, you will refund me any unearned CPI charge and provide me with a statement of refund.

BRITE Michigan 7/2016

LESSEE(S) INITIALS _____

Page 3 of 10

# EXHIBIT 3

**10. USE OF VEHICLE AND CONSENT TO MODIFY.** I assume all risk of loss related to the use of the Vehicle. I will be responsible for any damage to the Vehicle or its destruction. I will not use the Vehicle (a) in violation of any law or for any unlawful purpose, (b) for the transportation of people or goods for hire, or (c) in any manner prohibited by my insurance policy (or any applicable CPI) or outside of the manufacturer's recommended uses. I will not allow an unlicensed driver to drive the Vehicle. Without your prior written consent, I will not (a) use the Vehicle for more than 30 days outside of the state where the Vehicle was originally registered, or (b) take the Vehicle outside the continental United States. I will not allow anyone else to do these things.

**11. LIENS AND INDEMNITY.** I will not permit the Vehicle or this Lease to become subject to any lien or encumbrance, except one you create. I also will indemnify you against any liability, loss or expense arising from the operation, condition or ownership of the Vehicle. I understand that under this indemnity I am obligated to pay your court costs and attorneys' fees in connection with any action against which I have indemnified you, to the extent the law permits. I also understand that this indemnity covers any claims made against you under the doctrine of strict liability.

**12. OFFICIAL FEES AND TAXES.** I will keep the Vehicle registered. I will pay, when due, all official fees, including registration fees, and taxes, including personal property taxes, ad valorem, sales, use or similar taxes, assessed on the Vehicle at the time of Lease origination or over the term of the Lease. I will pay these fees and taxes whether they are billed by the government or by you during or after the Lease Term. If I do not pay the fees and taxes when due, you may pay them for me. If you pay my fees or taxes on my behalf, you may ask that I reimburse you immediately or you may add the fees and taxes to my periodic payment. I understand that my periodic payment may change if the amount of official fees and taxes I owe under the terms of this Lease changes. I will not have to pay your income taxes.

**13. VEHICLE MAINTENANCE AND STANDARDS FOR WEAR AND USE.** I will maintain the Vehicle in good working order and repair. I will pay all operating costs, such as gasoline, oil, and replacement tires. I will, at my expense, service the Vehicle according to the owner's manual maintenance schedule. If the Vehicle is recalled, I will have the recall repairs or service performed. I will use original equipment manufacturer's parts or those of equal quality and value in the maintenance and service of the Vehicle. You may, but are not required to, provide me with a replacement vehicle for any reason. I will maintain and keep in the Vehicle a record of all maintenance performed on the Vehicle. This maintenance record will be available to you at any time, and will be provided to you at the end of the Lease. Unless I obtain your written consent beforehand, I will not: (A) alter or install equipment on the Vehicle, or otherwise modify the Vehicle, or (B) make any changes to the Vehicle (such as adding or removing parts or painting the Vehicle) which would decrease its value, limit its use or void any manufacturer's warranty.

When I return the Vehicle it will be in "Good Condition," which shall mean: (A) the Vehicle will be in good operating order and appearance, without excess wear; (B) all manufacturer recommended servicing will have been performed on the Vehicle throughout the Lease Term; (C) the Vehicle will be saleable at wholesale, without deductions for condition; (D) the Vehicle does not require repair or replacement of any item listed below; and (E) the Vehicle's odometer operates properly, has not been repaired or replaced, and continuously reflects the Vehicle's actual mileage. (See also Paragraph 14.)

I recognize that the failure to maintain the Vehicle in Good Condition includes returning the Vehicle with the following required items of repair or replacement (which must be made with original equipment manufacturer's parts or those of equal quality):

Repair of:

(A)  Inoperative mechanical parts including power accessories;

(B)  Dents, scratches, chips or rusted areas or series of these on the wheels, rims or the body; including the bed of the truck;

(C)  Mismatched paint or any mark left by special identification;

(D)  Cracks, scratches, pits or chips in the windshield, broken windows or inoperative window mechanisms or broken headlight lenses or sealed beams;

(E)  Bumper dents or scratches through the chrome or bumpers;

(F)  Broken grilles or dents in the grilles;

(G)  Dents on other trim parts, including headlight and taillight bezels;

(H)  Seats, seat belts, headlining, door panels or carpeting which is torn or damaged beyond ordinary wear and tear or burned;

(I)  Any condition that renders the Vehicle unsafe, incapable of passing any required inspection or makes the Vehicle run noisy, rough or unsafely; and

(J)  Any other wear beyond the normal wear that would result from using (Paragraph 10) and maintaining (Paragraph 13) the Vehicle as this Lease requires.

Replacement of:

(A)  Tires that have sidewall plugs, gouges, cuts or exposed cords, any tire not part of a matching set of 5 tires (or 4 with emergency "doughnut" spare), or tires with less than 1/8 inch of tread remaining at the shallowest point; and

(B)  Missing parts, accessories and adornments, including bumpers, ornamentation, aerials, hubcaps, chrome stripping, rear view mirrors, radio and stereo components and spare tire.

After an early termination of the Lease that is subject to Paragraph 19, I agree to pay any amounts you spend to put the Vehicle in Good Condition, to the extent allowed by law. After the scheduled end of the Lease Term and after an early termination of the Lease that is subject to Paragraph 22, I agree to pay any amounts that it would take, based upon the good faith estimate of a qualified repair person or facility, to put the Vehicle in Good Condition, even if you do not perform such repairs, to the extent allowed by law.

I will not owe a charge for excess Mileage or be required to return the Vehicle in Good Condition if I purchase the Vehicle.

BRITE Michigan 7/2016

LESSEE(S) INITIALS

Page 4 of 10

# EXHIBIT 3

14. **MILEAGE REQUIREMENTS.** I understand that I am required to maintain the odometer of the Vehicle so that it always reflects the Vehicle's actual mileage. If at any time, I find that the Vehicle's odometer is inoperable, I will provide you with a reasonable estimate of the Vehicle's mileage. Within a reasonable time after you request it, I will certify the mileage of the Vehicle to you. You may ask me for the certification of the Vehicle's mileage more than once over the term of this Lease. If I am unable to certify or provide reasonable evidence of the Vehicle's mileage due to an inoperable Odometer, I agree to pay you for the Vehicle's reduction in fair market value, based upon your reasonable estimate that results from my inability to provide the evidence of the Vehicle's actual mileage.

**Important Note:** Federal law requires me to tell you the Vehicle's mileage in connection with a transfer of Vehicle ownership. I may be fined and/or imprisoned if I do not complete the disclosure or if I make a false statement.

15. **LIMITS ON MY ASSIGNMENT.** You may assign your interest in the Vehicle and any rights you have under this Lease. Any assignee of your interest and rights may also reassign those rights. Upon notice of assignment, I will make payments to any assignee as directed. My obligation under this Lease does not change if you assign the Vehicle or the Lease. I UNDERSTAND THAT I HAVE NO RIGHT TO ASSIGN ANY INTEREST IN THE LEASE OR THE VEHICLE WITHOUT YOUR PRIOR EXPRESS CONSENT.

16. **PARKING TICKETS, TOLLS AND TAXES.** I agree to pay all parking tickets, tolls, and traffic fines relating to the Vehicle. If I do not pay those tickets, tolls and fines, you may pay those tickets, tolls, and fines for me. I will reimburse you for those payments, plus any Administrative Fee you impose (see Paragraph 7) upon your request, or you may add the amount of the tickets, tolls, and fines you pay, plus the Administrative Fees, to what I owe you under this Lease.

## ENDING THE LEASE

17. **SCHEDULED TERMINATION LIABILITY.** I have no right to extend this Lease. If it is not terminated early, this Lease terminates at the scheduled end of the Lease Term set forth in Paragraph 1. Unless I choose to purchase the Vehicle, I agree that upon the expiration of the Lease, I will return the Vehicle to a place you will specify. If I do not return the Vehicle to you at the expiration of the Lease then I will be in default, but this Lease will remain in full force and effect until the Vehicle is returned or the Lease is otherwise terminated. Before surrender of the Vehicle, I will allow the Vehicle to be inspected by your inspection company. When I surrender the Vehicle, I will return the "Turn In Receipt and Odometer Statement" you have provided me, properly completed. I understand that, if I fail to return the Vehicle to the place you specify, I have agreed under Paragraph 23 to reimburse your costs to transport the Vehicle there. I agree that if I do not purchase the Vehicle, my payment liability at the scheduled end of the Lease Term will be the sum of:

    a.  A Disposition Fee of $450, unless waived under Paragraph 33; plus

    b.  Any charge I may owe under Paragraph 13; plus

    c.  Any excess Mileage charge described in Paragraph 2.L; plus

    d.  Any Other Amounts Due (see Paragraph 29); minus

    e.  Any Other Credits (see Paragraph 29).

I realize that some of my liabilities at the scheduled end of the Lease Term may not be determined until after the Vehicle is surrendered to you.

18. **PURCHASE OPTIONS.** At the scheduled end of the Lease Term, I have the option to purchase the Vehicle from you for the amount stated in Paragraph 2.J. Before the scheduled end of the Lease Term, I have the option to purchase the Vehicle from you for the Lease Balance as described in Paragraph 6.

If I purchase the Vehicle during or at the scheduled end of the Lease Term, I will also owe any Other Amounts Due and receive a credit for any Other Credits (see Paragraph 29). If I want to trade in the Vehicle (receive a trade-in allowance for the returned Vehicle), I understand that I must first purchase the Vehicle and pay the purchase price as set forth above. If I purchase the Vehicle, I will not owe an excess Mileage charge under Paragraph 2.L. or any amount under Paragraph 13.

Whether I purchase the Vehicle during or at the scheduled end of the Lease Term, my purchase will be on an "AS-IS, WHERE-IS, AND WITH ALL FAULTS" basis, to the extent the law permits. If I purchase the Vehicle, the Vehicle will no longer be eligible for CPI.

19. **EARLY TERMINATION.** I may terminate this Lease at any time before the scheduled end of the Lease Term by returning the Vehicle to a place you will specify. You may terminate this Lease and require me to return the Vehicle before the scheduled end of the Lease Term after my default as Paragraph 23 provides. Before surrender of the Vehicle, I will allow the Vehicle to be inspected by your inspection company. When I surrender the Vehicle, I will return the "Turn In Receipt and Odometer Statement" you have provided me, properly completed. I agree that, except as specified in Paragraphs 18, 20 or 22, my payment liability upon early termination will be the sum of:

    (A)  A Disposition Fee of $450, unless waived under Paragraph 33; plus

    (B)  Any charge I may owe you under Paragraph 13; plus

    (C)  If the Lease Balance described in Paragraph 6 exceeds the "realized value" described below, the lesser of: (i) the difference between the Lease Balance and the realized value, or (ii) the sum of the remaining periodic lease payments, not yet due, any estimated repair charges, calculated as provided in Paragraph 13 for the scheduled end of the Lease Term, and any excess Mileage charges as calculated in Paragraph 2.L., which would have been due if this Lease had ended on the scheduled end of the Lease Term; plus

    (D)  Any Other Amounts due (see Paragraph 29); minus

    (E)  Any Other Credits (See Paragraph 29).

LESSEE(S) INITIALS :

# EXHIBIT 3

For purposes of calculating my voluntary early termination liability, the "realized value" will be determined in one of the following ways:

1. By a written agreement between you and me establishing the realized value, if it is signed within a reasonable time after termination of the Lease;

2. By a professional appraisal of the wholesale value of the Vehicle obtained at my expense within a reasonable time after termination of the Lease, if you and I agree to my selection of an independent third party qualified to make the appraisal; or

3. If the realized value is not determined as provided in subparagraph 1. or 2., you will dispose of the Vehicle in a commercially reasonable manner (which may include disposition at a wholesale auction) or decide to retain it. If the Vehicle is disposed of, the disposition proceeds will be considered the realized value. If you retain the Vehicle, the Wholesale Fair Market Value of the Vehicle will be considered the realized value. For the purposes of this Lease, "Wholesale Fair Market Value" shall mean the highest offer you receive for disposition of the Vehicle or the price a dealer would pay to purchase the Vehicle from a dealer auction. I understand that the realized value amount will be exclusive of any official fees and taxes imposed upon disposition.

**20. VEHICLE ACCIDENT AND DAMAGE, OR LOSS.** I agree to be responsible for the risk of loss, theft, damage, confiscation, forfeiture or destruction of the Vehicle during the Lease Term and until I return the Vehicle to you, as described in this Paragraph 20. I will notify you, as soon as possible, of any of the following occurrences or conditions and will cooperate with you and, where relevant, my and your insurance company(ies) in resolving the matter: (A) The Vehicle is in an accident where there is personal injury or damage to somebody else's property; (B) The Vehicle is damaged or destroyed in an accident or other occurrence; (C) The Vehicle is exposed to confiscation or forfeiture or is confiscated or forfeited by any governmental authority; or (D) The Vehicle is stolen or is abandoned.

If the Vehicle is: (i) damaged and is determined by the insurance company insuring it or by you if the Vehicle is uninsured, to be beyond reasonable repair; (ii) lost or stolen; or (iii) if any other occurrence or condition involving your potential loss of the Vehicle as described above happens (a "Total Loss"), you may terminate the Lease. I realize you have no obligation to replace the Vehicle after a Total Loss.

If you do not terminate the Lease after the Vehicle is damaged, I will repair the Vehicle, as required by Paragraph 13, and any insurance proceeds you receive under either my insurance or CPI will be applied to the repair costs. If the repair is being done under CPI, I will have the repairs made at a repair facility you specify which is reasonably close to where I live.

If the Lease is terminated after a Total Loss, I will owe the sum of the following amounts instead of the early termination liability computed under Paragraph 19:

(A) If the Vehicle is returned to you, a Disposition Fee of $450; plus

(B) The Lease Balance described in Paragraph 6; minus

(C) The insurance proceeds you receive under my insurance policy or CPI; minus

(D) Any proceeds you receive from selling the vehicle salvage.

If the sum of the amounts above is less than zero, I will not receive any credit for that amount. I will also owe any Other Amounts Due and receive a credit for any Other Credits (see Paragraph 29).

If I purchased an optional GAP Waiver (see Paragraph 5), the GAP Waiver Agreement determines how much of my liability for the GAP Amount under this Paragraph 20 you will waive. If I did not purchase an optional GAP Waiver, I am liable for the full GAP amount as part of my liability under this Paragraph 20.

### EARLY TERMINATION PAYOFF STATEMENT

If a Total Loss occurs, the early termination payoff balance under this Lease due from me under this Lease may be different than the actual cash value the insurance company sets for the Vehicle.

If the Lease ends early because of a Total Loss, the amount I owe will include any difference between this early termination payoff amount and the actual cash value you receive from the insurer, unless I purchase an optional gap waiver (see Paragraph 5) that waives all or part of this difference.

I read and understand this statement.
LESSEE(S) INITIALS ( _____ )

**21. SECURITY DEPOSIT.** This paragraph applies if I paid a security deposit. You do not keep the security deposit separate in a bank or earmarked on your books, except where the law requires it. You can apply any part or all of the security deposit to my outstanding obligations under this Lease, or to the price of the Vehicle, should I exercise my option to purchase it. I have the right to receive any unused part of my security deposit, except as provided in Paragraph 22. The unused portion will be returned to me at the end of the Lease. Except where a fiduciary duty is imposed by applicable law, you have no fiduciary duty to me with respect to the security deposit. I am not entitled to interest, increase, or profit on the security deposit and none will be paid to me.

**22. INCOME LOSS PROTECTION.** I may terminate this Lease at any time before the scheduled end of the Lease Term under the following circumstances ("Income Loss Protection"):

(A) The Vehicle mileage does not exceed the Mileage set forth in Paragraph 2.I. and the Vehicle is not a Total Loss;

(B) I have paid all periodic payments due under this Lease, as of the date I terminate this Lease;

(C) I have lost my primary source of income (included in my Lease application) involuntarily (for example, I was laid off, my employer shut down, or I was terminated for job performance reasons other than misconduct);

(D) I have not lost my primary source of income because I was fired for committing a crime or for disciplinary reasons; .

(E) I have submitted to you the reasonable evidence that you request to corroborate the loss of my primary source of income and the reason for such loss, including but not limited to a letter from my former employer on company letterhead or one of your representatives has obtained reasonable verification from my former employer; or both.

If you determine I am eligible for a termination of the Lease for Income Loss Protection, I will return the Vehicle to a place you will specify. Before surrender of the Vehicle, I will allow the Vehicle to be inspected by your inspection company. When I surrender the Vehicle, I will return the "Turn In Receipt and Odometer Statement" you have provided me, properly completed.

LESSEE(S) INITIALS ( _____ )

# EXHIBIT 3

If I satisfy the requirements of this Paragraph 22, my early termination liability will be the lesser of:

1. The sum of:
    (i) Any estimated repair charges, calculated as provided in Paragraph 13 as if this Lease had terminated at the scheduled end of the Lease Term; plus
    (ii) The refundable security deposit (see Paragraph 2.E.(4)); plus
    (iii) the dollar amount of any Other Credits described in Paragraph 29; plus
    (iv) Any Other Amounts Due; or
2. The early termination liability computed under Paragraph 19.

**23. DEFAULT AND REMEDIES.** I will be in default if: (A) I fail to pay any payment when due; (B) I fail to pay any other amount I owe under this Lease when you ask for it; (C) I give any false or misleading information in any Lease application; (D) I fail to maintain required insurance; (E) I lose possession of the Vehicle by seizure, confiscation, or other involuntary transfer; (F) I transfer the Vehicle without your written consent; (G) I assign this Lease without your written consent; (H) I take an action that substantially impairs the Vehicle or my ability to pay under this Lease; (I) I file for bankruptcy or a bankruptcy proceeding is started against me or the Vehicle; (J) I do not bring back the Vehicle when this Lease requires it; (K) I break any other promise in this Lease or take any other action considered a default under applicable law.

If I default, you may do any of the following:

(A) Terminate this Lease and require me to pay the amount due at early termination (see Paragraph 19 and 20, as applicable);

(B) Take any action you reasonably believe will protect your interest in the Vehicle. For example, you may buy insurance. Your action will not cure my default;

(C) Add any expenses you incur taking these actions to my outstanding Lease balance. You may charge me rent on the amount added, or at your option, ask me to pay these amounts right away;

(D) If the Vehicle has a starter interrupt system, disable the starter on the Vehicle;

(E) Take (recover) the Vehicle where you find it; if the law allows it;

(F) Cancel any optional products and services included with this Lease. You may apply any refund you receive to the outstanding Lease balance. I hereby instruct any provider to make any refund due me to you;

(G) File suit against me for damages or to recover the Vehicle; and/or

(H) Do anything else permitted by law to exercise your rights to the Vehicle or your rights under this Lease.

After default, you will provide me any notice and wait the time the law requires before taking any action listed above.

☒ If the box before this sentence is checked, I acknowledge that you have installed an electronic tracking device in the Vehicle and I agree that you may use it to locate the Vehicle for recovery.

LESSEE(S) INITIALS: (  )

You will exercise your rights only in lawful ways, without a breach of the peace. You may use the license plates on the Vehicle to move it to a storage place. Upon recovery of the Vehicle, I will have no rights to the Vehicle, unless applicable law gives me the right to cure my default and reinstate the Lease. If you find any personal items in the Vehicle, you may take them and store them for me. I may recover any personal items that are in the Vehicle. If I do not ask for these items back, you may dispose of them as the law allows. I must notify you that there is personal property in the Vehicle within 10 days of recovery, or you will not be responsible for the property. If permitted by law, I will pay your reasonable expenses of taking any action in this Paragraph 23. These expenses may include expenses of taking and storing the Vehicle, attorney's fees, collection costs, and court costs.

---

**OTHER INFORMATION**

**24. RETURNED PREMIUMS AND REFUNDS.** If I bought any insurance, service contract, or other product in connection with this Lease, and the insurance, service contract, or other product is cancelled for any reason, I assign you the right to receive all returned premiums and refunds. You may apply the returned premiums and refunds to reduce the amount outstanding under this Lease.

**25. OWNERSHIP OF VEHICLE.** I understand that I am leasing this Vehicle. I have no ownership rights unless I exercise my purchase option. You are the sole owner of the Vehicle. This Lease is a true Lease for tax and other purposes.

**26. INSPECTION OF VEHICLE.** You may inspect the Vehicle at any reasonable time and place. You must provide me reasonable notice of inspection. I agree that I will cooperate with any reasonable inspection request.

**27. WAIVER.** You may delay or refrain from enforcing any of your rights under this Lease without losing them.

**28. SERVICING AND COLLECTION CONTACTS.** You may try to contact me at any mailing address, e-mail address, or phone number I give you as the law allows. You may try to contact me in writing using mail, e-mail, and text messages. You may also try to contact me by phone, including contacts using prerecorded or artificial voice messages and automatic telephone dialing systems. I agree that you may contact me by any or all methods listed and other methods the law allows to service or collect on my Lease account. You will not charge me for using any particular contact method, but I may be charged by my cell phone carrier for the contact.

**29. OTHER AMOUNTS DUE AND OTHER CREDITS.** Regardless of how this Lease ends, I will owe you the following amounts ("Other Amounts Due"): (A) Any official fees and taxes related to the termination or purchase, and (B) Any other amounts due under this Lease at the time this Lease Ends, including any unpaid CPI charges and any other unpaid amounts due because I failed to meet my obligations under this Lease. If this Lease ends early, you may cancel any optional insurance, maintenance, service, or other contracts included in this Lease or claim benefits under them to reduce what I owe or repair the Vehicle ("Other Credits").

LESSEE(S) INITIALS (  )

# EXHIBIT 3

30. **RIGHT TO SETTLE CLAIMS.** I authorize you or your agent to settle any insurance claim in the event there is any loss of or damage to the Vehicle. I authorize you to sign my name on any title or registration paperwork, or any check, draft, or other form of payment that you receive for that loss or damage to the Vehicle.

31. **ENFORCEABILITY.** If any part of this Lease is invalid, unenforceable or illegal in any state or territory, the part that is invalid, unenforceable or illegal will not be effective in that state or territory, and this Lease will be read as if that part was not contained in the Lease. Except as provided in the Arbitration Provision below, the rest of the Lease will be enforceable.

32. **GENERAL.** We further agree to all of the following:

   (A)   If more than one lessee signs this Lease, all lessees will be jointly and severally liable. Additionally, you can waive or delay enforcement of your rights as to one lessee without affecting your rights as to any other lessees. You can also release any lessee from his or her obligations without releasing any other lessees from their obligations.

   (B)   Notices under this Lease must be in writing addressed to the appropriate one of us at the address shown above (for the Lessee(s)) or shown below (for the Lessor) and must be mailed by U.S. Mail, first class postage prepaid, and we will each notify the other promptly of a change in address.

   (C)   Any changes to this Lease must be in a writing signed by you.
          LESSEE(S) INITIALS ( DL )

   (D)   You have not given me any information on which I am relying regarding the tax consequences of this Lease.

   (E)   Amounts other than periodic lease payments will be due when I receive your related invoice.

33. **DISPOSITION FEE WAIVER AND CREDIT FOR UNUSED MILES.** ☐ If this box is checked, then I may qualify for a waiver of the Disposition Fee described in Paragraph 2.C. and for a credit for unused miles. To qualify for this waiver and credit, all of the following must be true: (A) This Lease ends no sooner than 24 months after the Lease Date; (B) At the same time the Lease ends, I replace this Lease with another lease that is assigned to Brite Financial; (C) I return the Vehicle with mileage at least 1,500 miles under the Mileage amount set forth in Paragraph 2.L; (D) I do not owe any charges under Paragraph 13; and (E) I am not past due on any amounts owed under this Lease or otherwise in default under Paragraph 23. If I qualify for a credit for unused miles, the amount of the credit will be the lesser of: (i) $ 0.15 times the number of miles the Vehicle is under the Mileage amount set forth in Paragraph 2.L, based on the Vehicle's odometer reading at the time it is returned; or (ii) the amount of one month's periodic payments.

34. **VEHICLE WARRANTIES AND DISCLAIMERS.** I understand that unless otherwise indicated in the check boxes in the next column, the Vehicle is subject to the manufacturer's standard warranty and I have those warranty rights. If indicated in the check boxes in the next column, you are providing me your standard used vehicle limited warranty.

Warranty papers that are separate from this Lease state any coverage limits.

The law gives me a warranty that the Vehicle conforms to the description in this Lease. **THERE ARE NO OTHER EXPRESS WARRANTIES ON THE VEHICLE.**

Except as prohibited by law, the following sentence applies: **YOU DISCLAIM ANY WARRANTIES IMPLIED BY LAW, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE.**

If you make a written warranty covering the Vehicle or, within 90 days of the Lease Date enter into a service contract covering the Vehicle, this disclaimer will not affect any implied warranties during the term of any written warranty or service contract.

LESSEE(S) INITIALS ( DL )

☑ Manufacturer's Standard Warranty is NOT applicable

☐ Lessor's Standard Used Vehicle Limited Warranty IS applicable

LESSEE(S) INITIALS ( DL )

# EXHIBIT 3

## ARBITRATION PROVISION
### THIS ARBITRATION PROVISION SIGNIFICANTLY AFFECTS MY RIGHTS.
**BY SIGNING BELOW, I ACKNOWLEDGE THAT I REVIEWED AND UNDERSTAND THIS ARBITRATION PROVISION.**

- Either you or I may choose to arbitrate any dispute we have.
- Arbitration means that an arbitrator will decide the dispute rather than a judge or court.
- If you and I settle our disputes in arbitration, you and I give up our rights to a jury trial. I also give up my right to participate as a member of a class in a class action or serve as a class representative.
- In arbitration, discovery, appellate rights, and other processes are more limited.

**ELECTION TO ARBITRATE.** Any claim or dispute, whether in contract, tort or otherwise (including the interpretation and scope of this clause and the arbitrability of any issue), between you, your employees, agents, successors or assigns, and me, which arises out of or relates in any manner to this Lease shall, at your or my election (or the election of your successors or assigns), be resolved by neutral, binding arbitration and not by a court action.

**CHOICE OF ARBITRATION ORGANIZATION.** I may choose the American Arbitration Association ("AAA") or National Arbitration and Mediation ("NAM") as the arbitration organization. I may also choose another arbitration organization, subject to your approval. I may obtain a copy of the rules of the AAA by visiting its web site (www.adr.org). I may obtain a copy of the rules of NAM by visiting its website (www.namadr.com).

**LOCATION OF ARBITRATION.** The arbitration hearing shall be conducted at a location convenient to me or as otherwise required by the rules of the chosen arbitration organization.

**FEES.** If I demand arbitration first, I will pay the filing fee if the chosen arbitration organization requires it. You agree to advance and/or pay any other fees and costs required by the rules of the chosen arbitration organization. The amounts you or I pay may be reimbursed in whole or in part by decision of the arbitrator.

**JUDGEMENT AND LIMITED RIGHT TO APPEAL.** The arbitrator's award shall be final and binding on all parties. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. There shall be a limited right to appeal to the extent allowed by the Federal Arbitration Act.

**APPLICABLE LAW.** This Arbitration Provision and any arbitration under this Arbitration Provision is governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). The arbitrator shall also apply substantive governing law and the applicable statute of limitations.

**CLASS ACTION WAIVER. ANY CLAIM OR DISPUTE WILL BE ARBITRATED ON AN INDIVIDUAL BASIS – NOT A CLASS ACTION. I MAY NOT BRING A CLASS CLAIM, ACT AS A CLASS REPRESENTATIVE, OR BE A CLASS MEMBER. I EXPRESSLY WAIVE ANY RIGHT I MAY HAVE TO ARBITRATE A CLASS ACTION.**

**EXCLUSION OF CERTAIN SMALL CLAIMS.** You waive the right to require me to arbitrate an individual claim if the amount I seek to recover qualifies as a small claim under applicable law and I pursue such a claim in a small claim court on an individual basis and not in a court of general jurisdiction.

**NON-JUDICIAL OR PROVISIONAL REMEDIES.** Neither you nor I waive the right to arbitrate by exercising self-help remedies, or seeking or obtaining provisional remedies or individual injunctive relief from a court.

**ENFORCEABILITY.** If any part of this Arbitration Provision other than the Class Action Waiver is found by a court or arbitrator to be unenforceable, the remainder shall be enforceable. If the Class Action Waiver is found by a court or arbitrator to be unenforceable, the remainder of this Arbitration Provision shall be unenforceable. This Arbitration Provision shall survive the termination of any contractual agreement between you and me, whether by default or repayment in full.

By signing below, I acknowledge that I have read and understand this Arbitration Provision.

Lessee Signs: _____    Lessee Signs: _____

# EXHIBIT 3

I AGREE TO THE TERMS OF THIS LEASE. I HAVE READ ALL PAGES OF THIS LEASE, HAVE READ THE ARBITRATION CLAUSE, AND RECEIVED A COMPLETELY FILLED-IN COPY OF THE LEASE BEFORE SIGNING BELOW. I ACKNOWLEDGE THAT I HAVE EXAMINED THE VEHICLE, THAT THE VEHICLE IS EQUIPPED AS I WANT AND THAT IT IS IN GOOD CONDITION. I ACCEPT THE VEHICLE FOR ALL PURPOSES OF THIS LEASE. I UNDERSTAND THAT I HAVE NO OWNERSHIP RIGHTS IN THE VEHICLE UNLESS I EXERCISE MY OPTION TO PURCHASE THE VEHICLE.

**LESSEE SIGNATURE(S)**

| Lessee Signature: | Date: 10/28/16 | Co-Lessee Signature: | Date: 10/28/16 |
|---|---|---|---|
| Type/Print Lessee Name: DAYLAN M LETT | | Type/Print Co-Lessee Name: SONYA WATKINS | |

**LESSOR'S ACCEPTANCE**

The Lessor's authorized signature indicates that the Lessor has accepted the terms, conditions and obligations of this Lease.

Lessor Name: CARITE OF REDFORD

Lessor Address: 14875 TELEGRAPH RD REDFORD, MI 48239

By: _____

Type/Print Name: Jonathan Sprow

Type/Print Title: AGENT

BRITE Michigan 7/2016

LESSEE(S) INITIALS

Page 10 of 10

# EXHIBIT 3

Exhibit 4

**EXHIBIT 3**

# PROFESSIONAL SERVICE CONTRACT TRANSMITTAL RECORD

APPROVED
AUG 1 2 2014

CHANGE ORDER #

STANDARD PO NUMBER

CONTRACT PO NUMBER 2892161

**Insurance Requirement**
ACCOUNTS PAYABLE WILL HOLD UP ALL CONTRACT PAYMENTS UNTIL ALL INSURANCE CERTIFICATES/POLICIES REQUIRED UNDER THE CONTRACT HAVE BEEN RECEIVED. CONTRACTORS SHOULD BE MADE AWARE OF THIS REQUIREMENT.

| TYPE OF CONTRACT: (Check One) | DEPARTMENT HEAD'S SIGNATURE | DEPARTMENT MUNICIPAL PARKING DEPARTMENT |
|---|---|---|
| ☐ CONSTRUCTION/DEMOLITION ☐ LEASE ☐ DEED X PROFESSIONAL SERVICES | N. L. White | |

| FUNDING SOURCE (Percent) | DEPARTMENT CONTACT PERSON | PHONE NO. |
|---|---|---|
| FEDERAL    % STATE    % CITY 100% OTHER    % | NORMAN WHITE | (313) 221-2500 |

CONTRACTOR'S NAME: **BOBBY'S TOWING INC**

DATE PREPARED
MAY 30, 2014

CONTRACTOR'S ADDRESS: 10807 LYNDON ST
Detroit, MI 48238

ROBERT HARDISON, PRESIDENT
DENISE HARDISON

| ENGINEER'S ESTIMATE ☐ | CONTRACT X    CHANGE ☐ |
|---|---|
| TOTAL CONTRACT AMOUNT | $51,000.00 |
| TOTAL CPO AMOUNT | $51,000.00 |
| CHANGE AMOUNT | $-0- |

PHONE NO. (313) 933-9305 / FAX NO. (313) 931-9263       X CORPORATION ☐ PARTNERSHIP ☐ INDIVIDUAL

FEDERAL EMPLOYER/SOCIAL SECURITY NUMBER:   26-2194060       MINORITY FIRM ☐ YES X NO

PURPOSE OF CONTRACT: **TOWING, ABANDONED VEHICLES, CITYWIDE** FOR A THREE (3) YEAR CONTRACT STARTING JULY 1, 2014 AND ENDING JUNE 30, 2017, TOTAL CONTRACT AMOUNT SHALL NOT EXCEED $51,000.00.

CHARGE ACCOUNT:     1000 -340083 -000144-617900 - 00102 - 000000 - A3570

| | APPROVER MUST ALSO MAKE APPROPRIATE NOTES IN ORACLE PURCHASE ORDER | TIME & DATE IN |
|---|---|---|
| TIME & DATE IN | REQUESTING DEPARTMENT | |
| | Municipal Parking Department | |
| | AUTHORIZED DEPARTMENT REPRESENTATIVE | |
| N 0 3 2014 | BUDGET ☒ RECOMMEND APPROVAL ☐ RECOMMEND DENIAL | JUN 1 2 2014 |
| | BUDGET DIRECTOR OR DEPUTY | |
| | GRANT MANAGEMENT SECTION ☐ RECOMMEND APPROVAL ☐ RECOMMEND DENIAL | 14 JUN 24 AM 10: 7 CITY OF DETROIT FINANCE DEPARTMENT PURCHASING DIVISION |
| | GRANT ACCOUNTANT | |
| N 13 2014 | FINANCE DEPARTMENT ☒ RECOMMEND APPROVAL ☐ RECOMMEND DENIAL | 6/13/14 |
| | FINANCE DIRECTOR OR DEPUTY | |
| | LAW DEPARTMENT ☒ RECOMMEND APPROVAL ☐ RECOMMEND DENIAL | 6/24/14 |
| | CORPORATION COUNSEL | |
| RECEIVED JUN 1 6 2014 CITY OF DETROIT CONTRACTS SECTION LAW DEPARTMENT | PURCHASING DIVISION Brenda Jackson PURCHASING DIRECTOR CITY COUNCIL APPROVAL JCC REFERENCE:  PAGE _____ DATE _____ | |

D-PO-15-0759     Use Only One Set For Each Contract Package (C JUL 2 2 2014   EH AUG 0 6 2014

# EXHIBIT 3

# SERVICES CONTRACT

## BETWEEN

## CITY OF DETROIT, MICHIGAN

## AND

# BOBBY'S TOWING INC
### 10807 LYNDON ST
### DETROIT, MI 48238
### Phone: (313) 933-9305 / Facsimile: (313) 931-9263

## CONTRACT NO.

# 2892161

(C:\DOCS\CONTRACT\EDWAJ\J32000\FORM\JE2453.DOC)

1

# EXHIBIT 3

## CONTRACT PROVISIONS

| | | |
|---|---|---|
| Article 1. | Definitions | 3 |
| Article 2. | Engagement of Contractor | 5 |
| Article 3. | Contractor's Representations and Warranties | 6 |
| Article 4. | Contract Effective Date and Time of Performance | 8 |
| Article 5. | Data to Be Furnished Contractor | 8 |
| Article 6 | Contractor Personnel and Contract Administration | 8 |
| Article 7. | Compensation | 10 |
| Article 8. | Maintenance and Audit of Records | 11 |
| Article 9. | Indemnity | 12 |
| Article 10. | Insurance | 13 |
| Article 11. | Default and Termination | 15 |
| Article 12. | Assignment | 19 |
| Article 13. | Subcontracting | 19 |
| Article 14. | Conflict of Interest | 20 |
| Article 15. | Confidential Information | 21 |
| Article 16. | Compliance with Laws | 21 |
| Article 17. | Amendments | 21 |
| Article 18. | Fair Employment Practices | 22 |
| Article 19. | Notices | 23 |
| Article 20. | Proprietary Rights and Indemnity | 23 |
| Article 21. | Force Majeure | 25 |
| Article 22. | Waiver | 26 |
| Article 23. | Miscellaneous | 26 |
| Signature Page | | 31 |
| | Exhibit A -Scope of Services | |
| | Exhibit B -Fee Schedule | |
| | Exhibit C -Sample Invoice Spreadsheet | |

{G:\DOCS\CONTRACT\EDWAJIA32000\FORMJE2453.DOC}

2

# EXHIBIT 3

## CITY OF DETROIT
## SERVICES CONTRACT

This Services Contract ("Contract") is entered into by and between the City of Detroit, a Michigan municipal corporation, acting by and through its **MUNICIPAL PARKING DEPARTMENT** ("City"), and **BOBBY'S TOWING, INC** ("Contractor"), a Detroit. Michigan based authorized towing company, with its principal place of business located at **10807 Lyndon St, Detroit, Michigan 48238.** Phone: **(313) 933-9305** / Fax: **(313) 931-9263.**

### Recitals:

Whereas, the City desires to engage the Contractor to render certain ("Services") as set forth in this Contract; and

Whereas, the Contractor desires to perform the Services as set forth in this Contract; and Accordingly, the parties agree as follows:

### Article 1.
### Definitions

1.01    The following words and expressions or pronouns used in their stead shall be construed as follows:

"Additional Services" shall mean any services in addition to the services set forth in Exhibit A that are related to fulfilling the objectives of this Contract and are agreed upon by the parties by written Amendment.

"Amendment" shall mean modifications or changes in this Contract that have been mutually agreed upon by the City and the Contractor in writing and approved by the City Council.

"Associates" shall mean the personnel, employees, consultants, subcontractors, agents, and parent company of the Contractor or of any Subcontractor, now existing or subsequently created, and their agents and employees, and any entities associated, affiliated, or subsidiary to the Contractor or to any subcontractor, now existing or subsequently created, and their agents and employees.

(G:\DOCS\CONTRACT\EDWAJ\J32000\FORM\JE2453.DOC)

# EXHIBIT 3

"City" shall mean the City of Detroit, a municipal corporation, acting through the office or department named in the Contract as contracting for the Services on behalf of the City.

"City Council" shall mean the legislative body of the City of Detroit.

"Contract" shall mean each of the various provisions and parts of this document, including all attached Exhibits and all Amendments, as executed and approved by the appropriate City departments or offices and by the City Council.

"Contractor" shall mean the party that contracts with the City by way of this Contract, whether an individual, sole proprietorship, partnership, corporation, or other form of business organization, and its heirs, successors, personnel, agents, employees, representatives, executors, administrators and assigns.

"Exhibit A" is the Scope of Services for this Contract and sets forth all pertinent data relating to performance of the Services.

"Exhibit B" is the Fee Schedule for this Contract and sets forth the amount of compensation to be paid to the Contractor, including any Reimbursable Expenses, and any applicable hourly rate information.

"Records" shall mean all books, ledgers, journals, accounts, documents, and other collected data in which information is kept regarding the performance of this Contract.

"Reimbursable Expenses" shall mean only those costs incurred by the Contractor in the performance of the Services, such as travel costs and document reproduction costs, that are identified in Exhibit B as reimbursable.

"Services" shall mean all work that is expressly set forth in Exhibit A, the Scope of Services, and all work expressly or impliedly required to be performed by the Contractor in order to achieve the objectives of this Contract.

"Subcontractor" shall mean any person, firm or corporation, other than employees of the Contractor, that contracts with the Contractor, directly or indirectly, to perform in part or assist the Contractor in achieving the objectives of this Contract.

# EXHIBIT 3

"Technology" shall mean any and all computer-related components and systems, including but not limited to computer software, computer code, computer programs, computer hardware, embedded integrated circuits, computer memory and data storage systems, whether in the form of read-only memory chips, random access memory chips, CD-ROMs, floppy disks, magnetic tape, or some other form, and the data retained or stored in said computer memory and data storage systems.

"Unauthorized Acts" shall mean any acts by a City employee, agent or representative that are not set forth in this Contract and have not been approved by City Council as part of this Contract.

"Work Product" shall mean the originals, or copies when originals are unavailable, of all materials prepared by the Contractor under this Contract or in anticipation of this Contract, including but not limited to Technology, data, studies, briefs, drawings, maps, models, photographs, files, records, computer printouts, estimates, memoranda, computations, papers, supplies, notes, recordings, and videotapes, whether such materials are reduced to writing, magnetically or optically stored, or kept in some other form.

## Article 2.
### Engagement of Contractor

2.01   By this Contract, the City engages the Contractor and the Contractor hereby agrees to faithfully and diligently perform the Services set forth in Exhibit A, in accordance with the terms and conditions contained in this Contract.

2.02   The Contractor shall perform in a satisfactory manner as shall be determined within the sole and reasonable discretion of the City.  In the event that there shall be any dispute between the parties with regard to the extent, character and progress of the Services to be performed or the quality of performance under this Contract, the interpretation and determination of the City shall govern.

2.03   The Contractor shall confer as necessary and cooperate with the City in order that the Services may proceed in an efficient and satisfactory manner.  The Services are deemed to include all conferences, consultations and public hearings or appearances deemed necessary by the City to ensure that the Contractor will be able to properly and fully perform the objectives as set forth in this Contract.

# EXHIBIT 3

2.04    All Services are subject to review and approval of the City for completeness and fulfillment of the requirements of this Contract. Neither the City's review, approval nor payment for any of the Services shall be construed to operate as a waiver of any rights under this Contract, and the Contractor shall be and will remain liable in accordance with applicable law for all damages to the City caused by the Contractor's negligent performance or nonperformance of any of the Services furnished under this Contract.

2.05    The Services shall be performed as set forth in Exhibit A, or at such other locations as are deemed appropriate by the City and the Contractor for the proper performance of the Services.

2.06    The City and the Contractor expressly acknowledge their mutual understanding and agreement that there are no third party beneficiaries to this Contract and that this Contract shall not be construed to benefit any persons other than the City and the Contractor.

2.07    It is understood that this Contract is not an exclusive services contract, that during the term of this Contract the City may contract with other firms to perform the same or similar services, or may simply perform the same of similar services itself, and that the Contractor is free to render the same or similar services to other clients, provided the rendering of such services does not affect the Contractor's obligations to the City in any way.

## Article 3.
### Contractor's Representations and Warranties

3.01    To induce the City to enter into this Contract, the Contractor represents and warrants that the Contractor is authorized to do business under the laws of the State of Michigan and is duly qualified to perform the Services as set forth in this Contract, and that the execution of this Contract is within the Contractor's authorized powers and is not in contravention of federal, state or local law.

3.02    The Contractor makes the following representations and warranties as to any Technology it may provide under this Contract:

(a) That all Technology provided to the City under this Contact shall perform according to the specifications and representations set forth in Exhibit A and according to any

6

# EXHIBIT 3

other specifications and representations, including any manuals, provided by the Contractor to the City;

(b) That the Contractor shall correct all errors in the Technology provided under this Contract so that such technology will perform according to Contractor's published specifications;

(c) That the Contractor has the full right and power to grant the City a license to use the Technology provided pursuant to this Contract;

(d) That any Technology provided by Contractor under this Contract is free of any software, programs or routines, commonly known as "disabling code," that are designed to cause such Technology to be destroyed, damaged, or otherwise made inoperable in the course of the use of the Technology;

(e) That any Technology containing computer code and provided under this Contract is free of any known or reasonably discoverable computer program, code or set of instructions, commonly known as a "computer virus," that is not designed to be a part of the Work Product and that, when inserted into the computer's memory: (i) duplicates all or part of itself without specific user instructions to do so, or (ii) erases, alters or renders unusable any Technology with or without specific user instructions to do so, or (iii) that provide unauthorized access to the Technology and

(f) That all Technology shall be delivered new and in original manufacturer's packaging and shall be fully warranted for repair or replacement during the term of this Contract as amended or extended.

(g) That any Technology that is provided to the City shall:

  (1)   Accurately recognize and process all time and date data including, but not limited to, daylight savings time and leap year data, and

  (2)   Use accurate same-century, multi-century, and similar date value formulas in its calculations, and use date data interface values that accurately reflect the correct time, date and century.

# EXHIBIT 3

## Article 4.
### Contract Effective Date and Time of Performance

4.01    This Contract shall be approved by the required City departments, approved by the City Council, and signed by the City's Purchasing Director.  The effective date of this Contract shall be the date upon which the Contract has been authorized by resolution of the City Council.  The term of this Contract shall terminate on June 30, 2017.

4.02    Prior to the approvals set forth in Section 4.01, the Contractor shall have no authority to begin work on this Contract.  The Finance Director shall not authorize any payments to the Contractor, nor shall the City incur any liability to pay for any services rendered or to reimburse the Contractor for any expenditure, prior to such award and approvals.

4.03    The City and the Contractor agree that the commencement and duration of the Contractor's performance under this Contract shall be determined as set forth in Exhibit A.

## Article 5.
### Data To Be Furnished Contractor

5.01    Copies of all information, reports, records, and data as are existing, available, and deemed necessary by the City for the performance of the Services shall be furnished to the Contractor upon the Contractor's request.  With the prior approval of the City, the Contractor will be permitted access to City offices during regular business hours to obtain any necessary data.  In addition, the City will schedule appropriate conferences at convenient times with administrative personnel of the City for the purpose of gathering such data.

## Article 6.
### Contractor Personnel and Contract Administration

6.01    The Contractor represents that, at its own expense, it has obtained or will obtain all personnel and equipment required to perform the Services.  It warrants that all such personnel are qualified and possess the requisite licenses or other such legal qualifications to perform the services assigned. If requested, the Contractor shall supply a résumé of the managerial staff or consultants it proposes to assign to this Contract, as well as a dossier on the Contractor's activities and major undertakings.

# EXHIBIT 3

6.02    The City may interview the Contractor's managerial staff and other employees assigned to this Contract. The Contractor shall not use any managerial staff or other employees to whom the City objects and shall replace in an expedient manner those rejected by the City. The Contractor shall not replace any of the personnel working on this Contract with new personnel without the prior written consent of the City.

6.03    When the City deems it reasonable to do so, it may, at its sole and complete discretion, assign qualified City employees or other contractors to complete the Services or to work with the Contractor to complete the Services. Nevertheless, it is expressly understood and agreed by the parties that the Contractor shall remain ultimately responsible for the proper completion of the Services that it alone performs.

6.04    The relationship of the Contractor to the City is and shall continue to be that of an independent contractor and no liability or benefits, such as workers' compensation, pension rights or liabilities, insurance rights or liabilities, or other rights or liabilities arising out of or related to a contract for hire or employer/employee relationship shall arise or accrue to either party or either party's agent, Subcontractor or employee as a result of the performance of this Contract. No relationship other than that of independent contractor shall be implied between the parties or between either party's agents, employees or Subcontractors. The Contractor agrees to indemnify, defend, and hold the City harmless against any claim based in whole or in part on an allegation that the Contractor or any of its Associates qualify as employees of the City, and any related costs or expenses, including but not limited to legal fees and defense costs.

6.05    The Contractor warrants and represents that all persons assigned to the performance of this Contract shall be regular employees or independent contractors of the Contractor, unless otherwise authorized by the City. The Contractor's employees' daily working hours while working in or about a City of Detroit facility shall be the same as those worked by City employees working in the facility, unless otherwise directed by the City.

6.06    The Contractor shall comply with and shall require its Associates to comply with all security regulations and procedures in effect on the City's premises.

# EXHIBIT 3

## Article 7.
## Compensation

7.01   Compensation for Services provided shall not exceed the amount per tow set forth in Exhibit B. The Contractor shall not receive reimbursement for any costs, expenses or fees pursuant to this Contract. Unless this Contract is amended pursuant to Article 16, this amount shall be the entire compensation to which the Contractor is entitled for the performance of Services under this Contract.

**City employee responsible for accepting performance under this Contract is:**

(Name)      James H. Canty, Jr.
(Dept)      Municipal Parking Department
(Title)      Department Manager II
(Address)   1600 W. Lafayette St.
Detroit, Michigan  48216
Telephone:   (313) 221-2583
Facsimile:   (313) 221-2593
Email:       Cantj@detroitmi.gov

**City employee from whom payment should be requested** with a copy to the using dept is:
(Please note: Request for payment should include completed, accurate invoice as well as all original tow slips attached as listed on invoice.)

(Name):     Angelique Henderson-Vaughn
(Dept)      Finance Department / Voucher Audit
(Title)      Voucher Audit Clerk
(Address)   642 CAYMC, 2 Woodward Ave
Detroit, Michigan 48226
Telephone:   (313) 224-6019
Facsimile:   (313) 224-1560
Email:       HendersonA@detroitmi.gov

# EXHIBIT 3

The City employee to which a copy of payment request must also be submitted is:

(Please note: Request for payment should include a copy of completed and accurate invoice. Copies of all tow slips should be attached as listed on invoice.)

(Name)       Linda Harris
(Dept)       Municipal Parking Department
(Title)      Department Manager I
(Address)    1600 W. Lafayette St.
Detroit, Michigan 48216
Telephone:   (313) 221-2500
Facsimile:   (313) 221-2593
Email:       HarrisLi@detroitmi.gov

### Article 8.
### Maintenance and Audit of Records

8.01   The Contractor shall maintain full and complete Records reflecting all of its operations related to this Contract. The Records shall be kept in accordance with generally accepted accounting principles and maintained for a minimum of three (3) years after the Contract completion date.

8.02   The City and any government-grantor agency providing funding under this Contract shall have the right at any time without notice to examine and audit all Records and other supporting data of the Contractor as the City or any agency deems necessary.

   (a)   The Contractor shall make all Records available for examination during normal business hours at its Detroit offices, if any, or alternatively at its facility nearest Detroit. The City and any government-grantor agency providing funds for the Contract shall have this right of inspection. The Contractor shall provide copies of all Records to the City or to any such government-grantor agency upon request.

   (b)   If in the course of such inspection the representative of the City or of another government-grantor agency should note any deficiencies in the performance of the Contractor's agreed upon performance or record-keeping practices, such deficiencies will be reported to the Contractor in writing. The Contractor agrees to promptly remedy and correct any such reported deficiencies within ten (10) days of notification.

# EXHIBIT 3

(c)  Any costs disallowed as a result of an audit of the Records shall be repaid to the City by the Contractor within thirty (30) days of notification or may be set off by the City against any funds due and owing the Contractor, provided, however, that the Contractor shall remain liable for any disallowed costs exceeding the amount of the setoff.

(d)  Each party shall pay its own audit costs. However, if the dollar amount of the total disallowed costs, if any, exceeds three percent (3%) of the total dollar amount of all the invoices which the Contractor has submitted to the City pursuant to this Contract up to the date of the beginning of the audit, the Contractor shall pay the City's audit costs.

(e)  Nothing contained in this Contract shall be construed or permitted to operate as any restriction upon the powers granted to the Auditor General by the City Charter, including but not limited to the powers to audit all accounts chargeable against the City and to settle disputed claims.

8.03  The Contractor agrees to include the covenants contained in Sections 8.01 and 8.02 in any contract it has with any Subcontractor, consultant or agent whose services will be charged directly or indirectly to the City for Services performed pursuant to this Contract.

## Article 9.
### Indemnity

9.01  The Contractor agrees to indemnify, defend, and hold the City harmless against and from any and all liabilities, obligations, damages, penalties, claims, costs, charges, losses and expenses (including, without limitation, fees and expenses for attorneys, expert witnesses and other consultants) that may be imposed upon, incurred by, or asserted against the City or its departments, officers, employees, or agents by reason of any of the following occurring during the term of this Contract:

(a)  Any negligent or tortious act, error, or omission attributable in whole or in part to the Contractor or any of its Associates; and

(b)  Any failure by the Contractor or any of its Associates to perform their obligations,

12

*(N:) Contracts* {G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2453.DOC}

# EXHIBIT 3

either express or implied, under this Contract; and

(c)    Any and all injury to the person or property of an employee of the City where such injury arises out of the Contractor's or any of its Associates performance of this Contract.

9.02    The Contractor shall examine all places where it will perform the Services in order to determine whether such places are safe for the performance of the Services.  The Contractor undertakes and assumes all risk of dangerous conditions when not performing Services inside City offices.  The Contractor also agrees to waive and release any claim or liability against the City for personal injury or property damage sustained by it or its Associates while performing under this Contract on premises that are not owned by the City.

9.03    In the event any action shall be brought against the City by reason of any claim covered under this Article 9, the Contractor, upon notice from the City, shall at its sole cost and expense defend the same.

9.04    The Contractor agrees that it is the Contractor's responsibility and not the responsibility of the City to safeguard the property that the Contractor or its Associates use while performing this Contract.  Further, the Contractor agrees to hold the City harmless for any loss of such property used by any such person pursuant to the Contractor's performance under this Contract.

9.05    The indemnification obligation under this Article 9 shall not be limited by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts or other employee benefit acts.

9.06    The Contractor agrees that this Article 9 shall apply to all claims, whether litigated or not, that may occur or arise between the Contractor or its Associates and the City and agrees to indemnify, defend and hold the City harmless against any such claims.

Article 10.

Insurance

10.01    During the term of this Contract, the Contractor shall maintain the following insurance, at minimum and at its expense:

(P:) Abandoned Vehicle Tow Contract Master 4-22-201jc *(N:) Contracts * {G:\IXXCS\CONTRACT\EDWAJ\A32000\FORM\JE2453.DOC}    13

# EXHIBIT 3

| TYPE | | AMOUNT NOT LESS THAN |
|---|---|---|
| (a) | Workers' Compensation | Michigan Statutory minimum |
| (b) | Employers' Liability | $500,000.00 minimum each disease<br>$500,000.00 minimum each person<br>$500,000.00 minimum each accident |
| (c) | Commercial General Liability Insurance (Broad Form Comprehensive) | $1,000,000.00 each occurrence<br>$2,000,000.00 aggregate |
| (d) | Automobile Liability Insurance (covering all owned, hired and personal and property protection insurance, including residual liability insurance under Michigan no fault insurance law) | $1,000,000.00 combined single limit for bodily injury and property damage |

10.02   The commercial general liability insurance policy shall include an endorsement naming the "City of Detroit" as an additional insured.  The additional insured endorsement shall provide coverage to the additional insured with respect to liability arising out of the named insured's ongoing work or operations performed for the additional insured under the terms of this Contract.  The commercial general liability policy shall state that the Contractor's insurance is primary and not excess over any insurance already carried by the City of Detroit and shall provide blanket contractual liability insurance for all written contracts.

10.03   Each such policy shall contain the following cross-liability wording: "In the event of a claim being made hereunder by one insured for which another insured is or may be liable, then this policy shall cover such insured against whom a claim is or may be made in the same manner as if separate policies had been issued to each insured hereunder."

10.04   All insurance required by this Contract shall be written on an occurrence-based policy form, if the same is commercially available.

# EXHIBIT 3

10.05  The Commercial General Liability policy shall be endorsed to have the general aggregate apply to the Services provided under this Contract only.

10.06  If during the term of this Contract changed conditions or other pertinent factors should, in the reasonable judgment of the City, render inadequate the insurance limits, the Contractor shall furnish on demand such additional coverage or types of coverage as may reasonably be required under the circumstances.  All such insurance shall be effected at the Contractor's expense, under valid and enforceable policies, issued by insurers licensed to conduct business in Michigan and are otherwise acceptable to the City.

10.07  All insurance policies shall name the Contractor as the insured and shall provide a commitment from the insurer that such policies shall not be canceled or reduced without written notice to the City as required in the policy.  Certificates of insurance evidencing the coverage required by this Article 10 shall, in a form acceptable to the City, be submitted to the City prior to the commencement of the Services and at least fifteen (15) days prior to the expiration dates of expiring policies.

10.08  If any work is subcontracted in connection with this Contract, the Contractor shall require each Subcontractor to effect and maintain the types and limits of insurance set forth in this Article 10 and shall require documentation of same, copies of which documentation shall be promptly furnished the City.

10.09  The Contractor shall be responsible for payment of all deductibles contained in any insurance required under this Contract.  The provisions requiring the Contractor to carry the insurance required under this Article 10 shall not be construed in any manner as waiving or restricting the liability of the Contractor under this Contract.

## Article 11.
### Default and Termination

11.01  This Contract shall remain in full force and effect until the end of its term unless otherwise terminated for cause or convenience according to the provisions of this Article 11.

11.02  The City reserves the right to terminate this Contract for cause.  Cause is an event of default.

# EXHIBIT 3

(a)    An event of default shall occur if there is a material breach of this Contract, and shall include the following:

(1)    The Contractor fails to begin work in accordance with the terms of this Contract; or

(2)    The Contractor, in the judgment of the City, is unnecessarily, unreasonably, or willfully delaying the performance and completion of the Work Product or Services; or

(3)    The Contractor ceases to perform under the Contract; or

(4)    The City is of the opinion that the Services cannot be completed within the time provided and that the delay is attributable to conditions within the Contractor's control; or

(5)    The Contractor, without just cause, reduces its work force on this Contract to a number that would be insufficient, in the judgment of the City, to complete the Services within a reasonable time, and the Contractor fails to sufficiently increase such work force when directed to do so by the City; or

(6)    The Contractor assigns, transfers, conveys or otherwise disposes of this Contract in whole or in part without prior approval of the City; or

(7)    Any City officer or employee acquires an interest in this Contract so as to create a conflict of interest; or

(8)    The Contractor violates any of the provisions of this Contract, or disregards applicable laws, ordinances, permits, licenses, instructions or orders of the City; or

(9)    The performance of the Contract, in the sole judgment of the City, is substandard, unprofessional, or faulty and not adequate to the demands of the task to be performed; or

# EXHIBIT 3

(10)   The Contractor fails in any of the agreements set forth in this Contract; or

(11)   The Contractor ceases to conduct business in the normal course; or

(12)   The Contractor tows to, and/or receives an abandoned vehicle on, their private tow lot or any lot other than a City-owned lot unless prior authorization is given in writing by the Municipal Parking Department for each such tow; or

(13)   The Contractor admits its inability to pay its debts generally as they become due.

(b)   If the City finds an event of default has occurred, the City may issue a Notice of Termination for Cause setting forth the grounds for terminating the Contract. Upon receiving a Notice of Termination for Cause, the Contractor shall have five (5) calendar days within which to cure such default. If the default is cured within said five (5) day period, the right of termination for such default shall cease. If the default is not cured to the satisfaction of the City, this Contract shall terminate on the fifth calendar day after the Contractor's receipt of the Notice of Termination for Cause, unless the City, in its complete and sole discretion, and in writing, gives the Contractor additional time to cure the default. If the default is not cured to the satisfaction of the City within the additional time allowed for cure, this Contract shall terminate for cause at the end of the extended cure period.

(c)   If, after issuing a Notice of Termination for Cause, the City determines that the Contractor was not in default, the rights and obligations of the parties shall be the same as if the Notice of Termination had been issued as a Notice of Termination for Convenience.   Alternatively, in the City's discretion, the Notice of Termination for Cause may be withdrawn and the Contract, if terminated, may be reinstated.

(d)   The Contractor shall be liable to the City for any damages the City sustains by virtue of the Contractor's breach or any reasonable costs the City might incur in enforcing or attempting to enforce this Contract.   Such costs shall include reasonable fees and expenses for attorneys, expert witnesses and other consultants.   However, if the Contractor makes a written offer prior to the initiation of litigation or arbitration, then the City shall not be entitled to such

# EXHIBIT 3

attorney fees unless the City declines the offer and obtains a verdict or judgment for an amount more than ten percent (10%) above the amount of the Contractor's last written offer prior to the initiation of litigation or arbitration. The City may withhold any payment(s) to the Contractor, in an amount not to exceed the amount claimed in good faith by the City to represent its damages, for the purpose of setoff until such time as the exact amount of damages due to the City from the Contractor is determined. It is expressly understood that the Contractor shall remain liable for any damages the City sustains in excess of any setoff.

(e)    The City's remedies outlined in this Article 11 shall be in addition to any and all other legal or equitable remedies permissible.

11.03    The City shall have the right to terminate this Contract at any time at its convenience by giving the Contractor five (5) calendar days written Notice of Termination for Convenience. As of the effective date of the termination, the City will be obligated to pay the Contractor only the towing fees for Services completed and accepted in accordance with Exhibit A in the amounts provided for in Exhibit B. The amount due to the Contractor shall be reduced by payments already paid to the Contractor by the City.

11.04    After receiving a Notice of Termination for Cause or Convenience, and except as otherwise directed by the City, the Contractor shall:

(a)    Stop work under the Contract on the date and to the extent specified in the Notice of Termination;

(b)    Preserve all Records and submit to the City such Records and reports as the City shall specify, and

(c)    Submit within thirty (30) days a final report of towing invoices and receiptsnds relating to this Contract.

11.05    After termination of the Contract, each party shall have the duty to assist the other party in the orderly termination of this Contract and the transfer of all rights and duties arising under the Contract, as may be necessary for the orderly, un-disrupted continuation of the business of each party.

# EXHIBIT 3

## Article 12.
## Assignment

12.01    The Contractor shall not assign, transfer, convey or otherwise dispose of any interest whatsoever in this Contract without the prior written consent of the City; however, claims for money due or to become due to the Contractor may be assigned to a financial institution without such approval. Notice of any assignment to a financial institution or transfer of such claims of money due or to become due shall be furnished promptly to the City. If the Contractor assigns all or any part of any monies due or to become due under this Contract, the instrument of assignment shall contain a clause stating that the right of the assignee to any monies due or to become due shall be subject to prior liens of all persons, firms, and corporations for Services rendered or materials supplied for the performance of the Services called for in this Contract.

## Article 13.
## Subcontracting

13.01    None of the Services covered by this Contract shall be subcontracted without the prior written approval of the City and, if required, any grantor agency. The City reserves the right to withhold approval of subcontracting such portions of the Services where the City determines that such subcontracting is not in the City's best interests.

13.02    Each subcontract entered into shall provide that the provisions of this Contract shall apply to the Subcontractor and its Associates in all respects. The Contractor agrees to bind each Subcontractor and each Subcontractor shall agree to be bound by the terms of the Contract insofar as applicable to the work or services performed by that Subcontractor.

13.03    Contractor and the Subcontractor jointly and severally agree that no approval by the City of any proposed Subcontractor, nor any subcontract, nor anything in the Contract, shall create or be deemed to create any rights in favor of a Subcontractor and against the City, nor shall it be deemed or construed to impose upon the City any obligation, liability or duty to a Subcontractor, or to create any contractual relation whatsoever between a Subcontractor and the City.

13.04    The provisions contained in this Article 13 shall apply to subcontracting by a Subcontractor of any portion of the work or services included in an approved subcontract.

# EXHIBIT 3

<u>13.05</u>  The Contractor agrees to indemnify, defend, and hold the City harmless against any claims initiated against the City pursuant to any subcontracts the Contractor enters into in performance of this Contract. The City's approval of any Subcontractor shall not relieve the Contractor of any of its responsibilities, duties and liabilities under this Contract. The Contractor shall be solely responsible to the City for the acts or defaults of its Subcontractors and of each Subcontractor's Associates, each of whom shall for this purpose be deemed to be the agent or employee of the Contractor.

## Article 14.
### Conflict of Interest

<u>14.01</u>  The Contractor covenants that it presently has no interest and shall not acquire any interest, direct or indirect, that would conflict in any manner or degree with the performance of the Services under this Contract. The Contractor further covenants that in the performance of this Contract no person having any such interest shall be employed by it.

<u>14.02</u>  The Contractor further covenants that no officer, agent, or employee of the City and no other public official who exercises any functions or responsibilities in the review or approval of the undertaking or performance of this Contract has any personal or financial interest, direct or indirect, in this Contract or in its proceeds, whether such interest arises by way of a corporate entity, partnership, or otherwise.

<u>14.03</u>  The Contractor warrants (a) that it has not employed and will not employ any person to solicit or secure this Contract upon any agreement or arrangement for payment of a commission, percentage, brokerage fee, or contingent fee, other than bona fide employees working solely for the Contractor either directly or indirectly, and (b) that if this warranty is breached, the City may, at its option, terminate this Contract without penalty, liability or obligation, or may, at its option, deduct from any amounts owed to the Contractor under this Contract any portion of any such commission, percentage, brokerage, or contingent fee.

<u>14.04</u>  The Contractor covenants not to employ an employee of the City for a period of one (1) year after the date of termination of this Contract without written City approval.

# EXHIBIT 3

## Article 15.
### Confidential Information

15.01  In order that the Contractor may effectively fulfill its covenants and obligations under this Contract, it may be necessary or desirable for the City to disclose confidential and proprietary information to the Contractor or its Associates pertaining to the City's past, present and future activities. Since it is difficult to separate confidential and proprietary information from that which is not, the Contractor shall regard, and shall instruct its Associates to regard, all information gained as confidential and such information shall not be disclosed to any organization or individual without the prior consent of the City. The above obligation shall not apply to information already in the public domain or information required to be disclosed by a court order.

15.02  The Contractor agrees to take appropriate action with respect to its Associates to ensure that the foregoing obligations of non-use and non-disclosure of confidential information shall be fully satisfied.

## Article 16.
### Compliance With Laws

16.01  The Contractor shall comply with and shall require its Associates to comply with all applicable federal, state and local laws.

16.02  The Contractor shall hold the City harmless with respect to any damages arising from any violation of law by it or its Associates. The Contractor shall commit no trespass on any public or private property in performing any of the Services encompassed by this Contract. The Contractor shall require as part of any subcontract that the Subcontractor comply with all applicable laws and regulations.

## Article 17.
### Amendments

17.01  The City may consider it in its best interest to change, modify or extend a covenant, term or condition of this Contract or require the Contractor to perform Additional Services that are not contained within the Scope of Services as set forth in Exhibit A. Any such change, addition, deletion, extension or modification of Services may require that the compensation paid to the Contractor by the City be proportionately adjusted, either

# EXHIBIT 3

increased or decreased, to reflect such modification. If the City and the Contractor mutually agree to any changes or modification of this Contract, the modification shall be incorporated into this Contract by written Amendment.

17.02   Compensation shall not be modified unless there is a corresponding modification in the Services sufficient to justify such an adjustment. If there is any dispute as to compensation, the Contractor shall continue to perform the Services under this Contract until the dispute is resolved.

17.03   No Amendment to this Contract shall be effective and binding upon the parties unless it expressly makes reference to this Contract, is in writing, is signed and acknowledged by duly authorized representatives of both parties, is approved by the appropriate City departments and the City Council, and is signed by the Purchasing Director.

17.04   The City shall not be bound by Unauthorized Acts of its employees, agents, or representatives with regard to any dealings with the Contractor and any of its Associates.

## Article 18.
## Fair Employment Practices

18.01   The Contractor shall comply with, and shall require any Subcontractor to comply with, all federal, state and local laws governing fair employment practices and equal employment opportunities.

18.02   The Contractor agrees that it shall, at the point in time it solicits any subcontract, notify the potential Subcontractor of their joint obligations relative to non-discrimination under this Contract, and shall include the provisions of this Article 18 in any subcontract, as well as provide the City a copy of any subcontract upon request.

18.03   Breach of the terms and conditions of this Article 18 shall constitute a material breach of this Contract and may be governed by the provisions of Article 11, "Default and Termination."

# EXHIBIT 3

## Article 19.
### Notices

19.01  All notices, consents, approvals, requests and other communications ("Notices") required or permitted under this Contract shall be given in writing, mailed by postage prepaid, certified or registered first-class mail, return receipt requested, and addressed as follows:

If to the **Municipal Parking Department** on behalf of the City:

Attn:  Mr. James H. Canty, Jr., Department Manager II
City of Detroit
Municipal Parking Department
1600 W. Lafayette St
Detroit, MI 48216

If to the **BOBBY'S TOWING INC.** ("Contractor"):

Attn:  Mr. Robert Hardison, President
Bobby's Towing Inc.
10807 Lyndon St
Detroit, MI 48238
Phone (313) 933-9305 / Facsimile (313) 931-9263

19.02  All Notices shall be deemed given on the day of mailing. Either party to this Contract may change its address for the receipt of Notices at any time by giving notice of the address change to the other party. Any Notice given by a party to this Contract must be signed by an authorized representative of such party.

19.03  The Contractor agrees that service of process at the address and in the manner specified in this Article 19 shall be sufficient to put the Contractor on notice of such action and waives any and all claims relative to such notice.

## Article 20.
### Proprietary Rights and Indemnity

20.01  The Contractor shall not relinquish any proprietary rights in its intellectual property (copyright, patent, and trademark), trade secrets or confidential information as a result of

(G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2453.DOC)

# EXHIBIT 3

the Services provided under this Contract. Any Work Product provided to the City under this Contract shall not include the Contractor's proprietary rights, except to the extent licensed to the City.

20.02    The City shall not relinquish any of its proprietary rights, including, but not limited to, its data, privileged or confidential information, or methods and procedures, as a result of the Services provided under this Contract.

20.03    The parties acknowledge that should the performance of this Contract result in the development of new proprietary and secret concepts, methods, techniques, processes, adaptations, discoveries, improvements and ideas ("Discoveries"), and to the extent said Discoveries do not include modifications, enhancements, configurations, translations, derivative works, and interfaces from the Contractor's intellectual property, trade secrets or confidential information, said Discoveries shall be deemed "Work(s) for Hire" and shall be promptly reported to the City and shall belong solely and exclusively to the City without regard to their origin, and the Contractor shall not, other than in the performance of this Contract, make use of or disclose said Discoveries to anyone. At the City's request, the Contractor shall execute all documents and papers and shall furnish all reasonable assistance requested in order to establish in the City all right, title and interest in said Discoveries or to enable the City to apply for United States patents or copyrights for said Discoveries, if the City elects to do so.

20.04    Any Work Product provided by the Contractor to the City under this Contract shall not be disclosed, published, copyrighted or patented, in whole or in part, by the Contractor. The right to the copyright or patent in such Work Product shall rest exclusively in the City. Further, the City shall have unrestricted and exclusive authority to publish, to disclose, to distribute and otherwise to use, in whole or in part, any of the Work Product. If Work Product is prepared for publication, it shall carry the following notation on the front cover or title page: "This document was prepared for, and is the exclusive property of, the City of Detroit, Michigan, a municipal corporation."

20.05    The Contractor warrants that the performance of this Contract shall not infringe upon or violate any patent, copyright, trademark, trade secret or proprietary right of any third party. In the event of any legal action related to the above obligations of the Contractor filed by a third party against the City, the Contractor shall, at its sole expense, indemnify, defend and hold the City harmless against any loss, cost, expense or liability arising out

24

*(N:) Contracts* (G:\DOCS\CONTRACT\EDWAJA32000\FORMJE2453.DOC)

# EXHIBIT 3

of such claim, whether or not such claim is successful.

20.06   The making of payments, including partial payments by the City to the Contractor, shall vest in the City title to, and the right to take possession of, all Work Product produced by the Contractor up to the time of such payments, and the City shall have the right to use said Work Product for public purposes without further compensation to the Contractor or to any other person.

20.07   Upon the completion or other termination of this Contract, all finished or unfinished Work Product prepared by the Contractor shall, at the option of the City, become the City's sole and exclusive property whether or not in the Contractor's possession. Such Work Product shall be free from any claim or retention of rights on the part of the Contractor and shall promptly be delivered to the City upon the City's request. The City shall return all of the Contractor's property to it. The Contractor acknowledges that any intentional failure or unreasonable delay on its part to deliver the Work Product to the City will cause irreparable harm to the City not adequately compensable in damages and for which the City has no adequate remedy at law. The Contractor accordingly agrees that the City may in such event seek and obtain injunctive relief in a court of competent jurisdiction to compel delivery of the Work Product, to which injunctive relief the Contractor consents, as well as seek and obtain all applicable damages and costs. The City shall have full and unrestricted use of the Work Product for the purpose of completing the Services.

## Article 21.
### Force Majeure

21.01   No failure or delay in performance of this Contract, by either party, shall be deemed to be a breach thereof when such failure or delay is caused by a force majeure event including, but not limited to, any Act of God, strikes, lockouts, wars, acts of terrorism, riots, epidemics, explosions, sabotage, breakage or accident to equipment, the binding order of any court or governmental authority, or any other cause, whether of the kind herein enumerated or otherwise, not within the control of a party. In the event of a dispute between the parties with regard to what constitutes a force majeure event, the City's reasonable determination shall be controlling.

# EXHIBIT 3

## Article 22.
### Waiver

22.01   The City shall not be deemed to have waived any of its rights under this Contract unless such waiver is in writing and signed by the City.

22.02   No delay or omission on the part of the City in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one (1) occasion shall not be construed as a waiver of any right on any future occasion.

22.03   No failure by the City to insist upon the strict performance of any covenant, agreement, term or condition of this Contract or to exercise any right, term or remedy consequent upon its breach shall constitute a waiver of such covenant, agreement, term, condition, or breach.

## Article 23.
### Miscellaneous

23.01   If any provision of this Contract or its application to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Contract shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

23.02   This Contract, including Exhibits, contains the entire integrated agreement between the parties; all prior negotiations, agreements, permits or rules relating thereto, and understandings of any type or nature, oral or written are merged into this Contract. Neither the City nor the City's agents have made any representations except those expressly set forth in this Contract, and no rights or remedies are, or shall be, acquired by the Contractor by implication or otherwise unless expressly set forth in this Contract. The Contractor waives any defense it may have to the validity of the execution of this Contract.

23.03   Unless the context otherwise expressly requires, the words "herein," "hereof," and "hereunder," and other words of similar import, refer to this Contract as a whole and not to any particular section or subdivision.

23.04   The headings of the sections of this Contract are for convenience only and shall not be used to construe or interpret the scope or intent of this Contract or in any way affect the

26

*(N.) Contracts* {G:\DOCS\CONTRACT\EDWAJJA32000\FORM\JE2453.DOC}

# EXHIBIT 3

same.

23.05  This Contract and all actions arising under it shall be governed by, subject to, and construed according to the law of the State of Michigan. The Contractor agrees, consents and submits to the exclusive personal jurisdiction of any state or federal court of competent jurisdiction in Wayne County, Michigan, for any action arising out of this Contract. The Contractor also agrees that it shall not commence any action against the City because of any matter whatsoever arising out of or relating to the validity, construction, interpretation and enforcement of this Contract in any state or federal court of competent jurisdiction other than one in Wayne County, Michigan.

23.06  If any Associate of the Contractor shall take any action that, if done by a party, would constitute a breach of this Contract, the same shall be deemed a breach by the Contractor.

23.07  The rights and remedies set forth in this Contract are not exclusive and are in addition to any of the rights or remedies provided by law or equity.

23.08  For purpose of the hold harmless and indemnity provisions contained in this Contract, the term "City" shall be deemed to include the City of Detroit and all other associated, affiliated, allied or subsidiary entities or commissions, now existing or subsequently created, and their officers, agents, representatives, and employees.

23.09  The Contractor covenants that it is not, and shall not become, in arrears to the City upon any contract, debt, or other obligation to the City including, without limitation, real property, personal property and income taxes, and water, sewage or other utility bills.

23.10  This Contract may be executed in any number of originals, any one of which shall be deemed an accurate representation of this Contract. Promptly after the execution of this Contract, the City shall provide a copy to the Contractor.

23.11  As used in this Contract, the singular shall include the plural, the plural shall include the singular, and a reference to either gender shall be applicable to both.

23.12  The rights and benefits under this Contract shall inure to the City of Detroit and its agents, successors, and assigns.

# EXHIBIT 3

23.13   The City shall have the right to recover by setoff from any payment owed to the Contractor all delinquent withholding, income, corporate and property taxes owed to the City by the Contractor, any amounts owed to the City by the Contractor under this Contract or other contracts, and any other debt owed to the City by the Contractor.

(Signatures appear on next page)

# EXHIBIT 3

IN WITNESS WHEREOF, the *City* and the *Contractor*, by and through their duly authorized officers and representatives, have executed this *Contract*.

WITNESSES:

1. *(Signature)*
   Floyd L. Love
   *(Print Name)*

2. *(Signature)*
   Kim M. Perry
   *(Print Name)*

WITNESSES:

1. *(Signature)*
   Cynthia Patterson
   *(Print Name)*

2. *(Signature)*
   Belinda Ellis
   *(Print Name)*

CONTRACTOR:    Bobby's Towing Inc.

BY: _____
*(signature)*
Authorizing Name: Denise Boyce-Hardison
Address: 10807 Lyndon St
City & State: Detroit, MI 48238
Telephone: (313) 933-9305 / Fax (313) 931-9263
Federal Identification Number: 26-2194060

CITY OF DETROIT FOR AGENCY:

Municipal Parking Department
BY: _____
*(Signature)*

Norman White
*(Print Name)*

ITS: Director
*(Title)*

THIS CONTRACT WAS APPROVED BY THE CITY COUNCIL ON JUL 2 2 2014

_____ AUG 06 2014
Purchasing Director    Date

APPROVED BY LAW DEPARTMENT PURSUANT TO SECTION 6-406 OF THE CHARTER OF THE CITY OF DETROIT

_____ 6/27/14
Corporation Counsel    Date

THIS CONTRACT IS NOT VALID OR AUTHORIZED UNTIL APPROVED BY RESOLUTION OF THE CITY COUNCIL AND SIGNED BY THE PURCHASING DIRECTOR.

ACKNOWLEDGEMENT OF A PERSON ACTING IN HIS (HER) OWN RIGHT

STATE OF MICHIGAN )
) SS.
COUNTY OF WAYNE )

The foregoing instrument was acknowledged before me this MAY 22, 2014 day of _____ May, 2014, by Denise Boyce-Hardison to me known to be the person described in

*("Name of Person Signing Contract")*

and who executed the foregoing instrument and acknowledged that he (she) executed the same as his (her) free and voluntary act and deed.

Notary Public
My Commission Expires:

LEAH J. SUTTON
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Dec 28, 2019
ACTING IN COUNTY OF WAYNE

# EXHIBIT 3

B

## CITY ACKNOWLEDGMENT

STATE OF MICHIGAN )

                    )SS.

COUNTY OF WAYNE )

      The foregoing contract was acknowledged before me the 30th day of May ,

2014, by _____ **Norman White** _____ ,

                    (name of person who signed the contract)

the _____ **Director** _____ ,

          (title of person who signed the contract as it appears on the contract)

of _____ **Municipal Parking Department** _____ ,

                  (complete name of the City department)

on behalf of the City.

**Sharon Clark Woodside**

Notary Public, County of Oakland

"Acting in Wayne County"

State of Michigan

My commission expires: 9/14/2016

# EXHIBIT 3

B

## CORPORATION CERTIFICATE OF AUTHORITY

I, _Denise Boyce·Hardison_, Corporate Secretary of
(name of corporate secretary)
_Boddy's Towing Service_, a _Mich_
(complete name of corporation)          (state of incorporation)

_Profit_ corporation (the "Corporation"), **DO HEREBY CERTIFY** that the
(non-profit or for profit)

following is a true and correct excerpt from the minutes of the meeting of the Board of Directors

duly called and held on _5/8/14_, and that the same is now in full force and effect:
(date of meeting)

"**RESOLVED**, that the Chairman, the President, each Vice President, the Treasurer, and the Secretary and each of them, is authorized to execute and deliver, in the name of and on behalf of the Corporation and under its corporate seal or otherwise, any agreement or other instrument or document ('Contract') in connection with any matter or transaction that shall have been duly approved; and the execution and delivery of any Contract by any of the aforementioned officers shall be conclusive evidence of such approval."

**FURTHER, I CERTIFY** that _Robert Lee Hardison_ is Chairman,
_Denise Boyce-Hardison_ is President,
_____ is (are) Vice President(s),
_Denise Boyce-Hardison_ is Treasurer,
_Denise Boyce-Hardison_ is Secretary,
_Denise Boyce-Hardison_ is Executive Director, and
_____ is _____.

**FURTHER, I CERTIFY** that any of the aforementioned officers or employees of the Corporation are authorized to execute and commit the Corporation to the conditions, obligations, stipulations and undertakings contained in the foregoing Contract between the City and the above-referenced Corporation and that all necessary corporate approvals have been obtained in relationship thereto.

**IN WITNESS THEREOF**, I have set my hand this _8_ day of _May_, 20 _14_.
CORPORATE SEAL
(if any)

_____
Corporation Secretary

**PLEASE NOTE THAT THE PERSON WHO SIGNS THE CONTRACT ON BEHALF OF YOUR CORPORATION MUST BE ONE OF THE INDIVIDUALS LISTED ABOVE AS PERSON AUTHORIZED TO EXECUTE CONTRACTS IN THE NAME OF AND ON BEHALF OF THE CORPORATION.**

LISA M WATKINS
Notary Public - Michigan
My Commission Expires Mar 26, 2020
Acting in the County of _Oakland_

(G:\DOCS\CONTRACTED\WA\JVA32\C\WNGRANT\E453.DOC)

# EXHIBIT 3

## CORPORATE ACKNOWLEDGMENT

STATE OF _Michigan_ )

COUNTY OF _Oakland_ )SS.

The foregoing contract was acknowledged before me the _8_ day of _May_,

20 _14_, by _Denice Boyce-Hardison_
      (name of person who signed the contract)

the _Owner_
      (title of person who signed the contract as it appears on the contract)

of _Bobbys Towing Service_
      (complete name of the corporation)

on behalf of the Corporation.

_Lisa M. Watkins_

Notary Public, County of _Oakland_

State of _Michigan_

My commission expires: _03-26-20_

LISA M WATKINS
Notary Public - Michigan
Wayne County
My Commission Expires Mar 26, 2020
Acting in the County of _Oakland_

[G:\DOCS\CONTRACT\EDWA\JA\32000\FORM\JE2453.DOC]

# EXHIBIT 3

**EXHIBIT A**
**"SCOPE OF SERVICES"**

I.    <u>Notice to Proceed</u>

The term of this Contract shall begin on **July 1, 2014** and shall <u>**terminate at 11:59 PM on June 30, 2017, unless extended by mutual agreement by an Amendment to the Contract for two additional one year terms**</u>.    The Contractor shall commence performance of this Contract upon receipt of a written "Notice to Proceed" from the City and in the manner specified in the Notice to Proceed.

II.    <u>Services to be Performed</u>

(a)    The purpose of this Contract is to include the Contractor in a non-exclusive pool of contractors eligible at the request of MPD, at MPD's complete and sole discretion, to tow abandoned vehicles in the City to City-owned lots. Notwithstanding anything in this Contract to the contrary, the City will determine allocation of tows as between eligible towers in any fashion the City deems appropriate in its sole and complete discretion. Contractor releases and waives any claim against the City, under any legal theory, arising from this Contract or otherwise, relating to the number or share of tows received by Contractor or any other entity, or the manner or process by which the City allocates tows as between eligible towers..

(b)    To be included in the pool of eligible Contractors who may be authorized to tow abandoned vehicles, Contractor shall have a minimum of <u>**two**</u> **(2)** trucks available for the performance of this Contract with the City of Detroit, including at least one 1 ½ Ton and one flat bed truckThe flat bed truck must be available for tows of one car or more than one car.  Within 24 hours of approval of this Contract by the City, the Contractor shall provide the City's MPD with the vehicle numbers and descriptions of the two vehicles it has available to provide Services pursuant to this Contract.  These vehicles must be available at all hours specified in this Contract throughout the term of the Contract.  If Contractor replaces either of these vehicles with another vehicle during the term of the Contract, Contractor must, within 24 hours, notify MPD and provide MPD with the vehicle numbers and descriptions of the new vehicle(s),

32

# EXHIBIT 3

as well as an updated insurance policy including the new vehicle(s) with the insurance coverage required by this Contract. The Contractor shall also provide MPD with updated insurance policies, or commitments to insure from its insurer(s), pursuant to this Contract 30 days prior of the expiration of each type of coverage on each policy. If the Contractor provides only a commitment to insure to the City, the Contractor shall immediately provide MPD with a firm policy on or before the commencement date of the coverage in that policy.

Contractor understands and acknowledges that failure to have either of the two vehicles available at any time during the term of this Contract when called upon by the City to perform a tow, or does not respond to the location of the abandoned vehicle in time, which is of the essence, shall result in the following changes to eligibility to receive requests for tows:

1. The first time that the Contractor does not have a towing vehicle available when the towing of an abandoned vehicle is requested by the City, or the towing vehicle does not arrive at the location of the abandoned vehicle within 30 minutes after the City has made the request for a tow, the Contractor shall not be eligible to receive another request for a tow for ten (10) calendar days thereafter.

2. The second time that the Contractor does not have a towing vehicle available when the towing of an abandoned vehicle is requested by the City, or the towing vehicle does not arrive at the location of the abandoned vehicle within 30 minutes after the City has made the request for a tow, the Contractor shall not be eligible to receive another request for a tow for thirty (30) calendar days thereafter.

3. The third time and each subsequent time thereafter that the Contractor does not have a towing vehicle available when the towing of an abandoned vehicle is requested by the City, or the towing vehicle does not arrive at the location of the abandoned vehicle within 30 minutes after the City has made the request for a tow, the Contractor shall not be eligible to receive another request for a tow for 60 calendar days thereafter.

4. The periods of ineligibility above shall apply separately for each year of the Contract. Ineligibility for periods of thirty (30) or sixty (60) days may occur because of any combination of the Contractor's non-availability and untimely

{P:} Abandoned Vehicle Tow Contract Master 4-22-14/jc

33

# EXHIBIT 3

arrival at the location of the abandoned vehicle during each year of the Contract.

(c) After each of the above periods elapse (10, 30, or 60 calendar days), and the Contractor decides that it desires to continue to participate in the eligible pool of towers under this Contract, the Contractor must provide the City with evidence that it still has two vehicles available pursuant to this Contract in order to again be eligible to be called for tows. Such evidence shall consist of a letter submitted by the Contractor to the MPD certifying that the Contractor has two vehicles available meeting the requirements of this Exhibit A, identifying each vehicle by its vehicle number and providing a current certificate of insurance for each such vehicle.

(d) If, for any reason, the Contractor does not receive any requests for tows by the City pursuant to this Contract within any 10-day period, whether because of ineligibility or for any other reason, the Contractor may, at its sole discretion, terminate its participation in this Contract by providing the City with seven days advance written Notice to the City, without any costs, fees, expenses or damages accruing to either party because of such termination, notwithstanding any other provision of this Contract, with the exception that the Contractor's indemnity and insurance obligations under this Contract shall remain in effect to cover events that occurred up to the date of termination.    If the Contractor terminates its participation in this Contract, it may again seek to become eligible to become part of the non-exclusive pool of contractors eligible to be authorized by the MPD to tow abandoned vehicles in the City to City-owned lots, after the end of the current term of this Contract, including any extensions, when the City issues new contracts for this purpose.

(e) Contractor shall be paid a flat rate of <u>**$125.00 for the towing of any vehicle**</u>, classified as abandoned vehicles (referred to herein as "ABAN vehicles"), less than 10,000 pounds gross vehicle weight for any vehicles that it is authorized to tow and does tow in accordance with this Contract. This rate shall be charged to and paid by the City pursuant to Exhibit B. This rate shall apply regardless of the time and the equipment used during such tows. If towing is authorized by the City, **towing services shall be conducted by the Contractor between the hours of 7:00 A.M. to 10:00 P.M., seven days a week.**    Contractor understands and agrees, and waives any federal, state or local rights or benefits to the contrary, that it provides the vehicles, equipment, management, labor,

34

{P:} Abandoned Vehicle Tow Contract Master 4-22-14/jc

# EXHIBIT 3

and any other items it requires to perform this Contract at its own cost, expense, fee and risk and that this Contract does not provide it with any rights, benefits, damages or remedies other than to be paid for tows actually requested by the City and performed by the Contractor in accordance with this Contract.

(f) **Contractor shall tow ABAN vehicles to the following location:**

> **City of Detroit - Impound Lot**
> **5997 Caniff St**
> **Detroit, MI 48212**

and/or any City-owned lot, designated by the City of Detroit Municipal Parking Department.

(g) Payment for Services provided under this Contract is governed by the terms of Ordinance No. 42-98, entitled "Prompt Payment of Vendors," being Sections 18-5-71 through 18-5-79 of the 1984 Detroit City Code.

(h) All the terms and conditions of this Contract are intended to be consistent with one another. However, in the event that there is any conflict or inconsistency between the terms and conditions in this Exhibit A, Scope of Services and the terms and conditions set forth from Article 1 up to and including Article 23 of this Contract, the terms and conditions in this Exhibit A, Scope of Services shall control.

# EXHIBIT 3

EXHIBIT B

"FEE SCHEDULE"

I. **General**

    (a) The Contractor shall be paid for those Services performed pursuant to this Contract a maximum amount of One Hundred Twenty Five and 00/100 Dollars ($125.00) for each tow performed at the request of the City and in accordance with this Contract, for the term of this Contract as set forth in Exhibit A, Scope of Services.

    (b) Payment for the proper performance of the Services shall be contingent upon receipt by the City of invoices for payment and corresponding authorization. Each invoice shall certify the total cost, itemizing costs when applicable. Each invoice must be received by the City not more than thirty (30) days after the close of the calendar month in which the services were rendered and must be signed by an authorized officer or designee of the Contractor.

II. **Project Billing**

The Contractor may submit a monthly invoice, not later than the 10th day of each month, requesting payment for all ABAN vehicles authorized by the City, to be towed and actually towed by the Contractor during the previous month. Each invoice must provide the following information for each abandoned vehicle for which Contractor is requesting payment: towing authorization number provided by the City, make and model, license plate number (if available), vehicle identification number (VIN), the date that the vehicle was towed, and the City-owned lot to which it was towed. This information must be provided in a spreadsheet format, so that all information pertaining to each vehicle towed is readily identifiable in one place on the spreadsheet. The invoice shall also state the total number of vehicles towed for the month.

Any invoice received that does not conform to the above requirements, shall be returned to the Contractor without payment pending correction. An example of acceptable invoice format is as shown in Exhibit C.

36

{P:} Abandoned Vehicle Tow Contract Master 4-22-14/jc

# EXHIBIT 3

EXHIBIT C

**Tow Company Name**
Address
City, State, Zip
Phone #: (   )____-_____

ABAN Invoice#_____

| City of Detroit Municipal Parking Department 1600 W. Lafayette St Municipal Center Detroit, MI 48216 | | | Supplier Tax ID | | |
|---|---|---|---|---|---|
| | | | Purchase Order #: | | |
| | | # of Transactions | Terms | | |
| | | | Amount Due This Invoice | $ | |
| Invoice Date: | | | *Past* Balance Forward $ | *Current* Balance Forward $ | |
| | | | | | |
| Date | Receipt # | District # | VIN/Plate | Make/Model | Amount |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total Due | | | | | |

(P:) Abandoned Vehicle Tow Contract Master 4-22-14/jc

37

# EXHIBIT 3

Exhibit 5

**EXHIBIT 3**

STATE OF MICHIGAN
IN THE 36th DISTRICT COURT

**BRITE FINANCIAL SERVICES, LLC,**
a Michigan Limited Liability Company,

                           Petitioner,

v.

**BOBBY'S TOWING SERVICE, LLC,**
a Michigan Limited Liability Company,

                           Respondent.

| | |
|---|---|
| **JASON MICHAEL KATZ, P.C.**<br>Jason M. Katz (P62923)<br>Robert E. Zielinski (P69250)<br>Attorneys for Petitioner<br>30665 Northwestern Highway, Suite 202<br>Farmington Hills, MI 48334<br>(248) 702-6310<br>Fax: (248) 702-6311 | **BOBBY'S TOWING SERVICE, LLC**<br>Respondent<br><u>Registered Office:</u><br>2744 W. Davison<br>Detroit, MI 48238<br>Resident Agent: Robert Hardison<br><br><u>Business Address:</u><br>10401 Lyndon St.<br>Detroit, MI 48238 |

## AFFIDAVIT OF PETITIONER

STATE OF MICHIGAN )
                      ) ss
COUNTY OF OKLAND)

Emily Perry, being first duly sworn, deposes and says as follows:

1. I am employed as the Abandonment Supervisor for Brite Financial Services, LLC ("Petitioner").

2. On June 20, 2017, I learned that a vehicle owned by Petitioner and leased to a third party, a 2013 Chevrolet Malibu VIN 1G11C5SA1DF228194 ("vehicle"), was in the custody of Bobby's Towing Service ("Respondent").

3. During a conversation with an employee of Respondent on June 20, 2017, I stated to Respondent that Petitioner is the title owner of the vehicle. The employee for Respondent replied to me that there were no police holds on the vehicle and that in order to obtain the vehicle, Petitioner needed to provide

# EXHIBIT 3

Respondent with a copy of the vehicle title, a hold harmless document and repossession order.

4. On my authority, I sent a representative of Petitioner to Respondent's office along with the documents requested by Respondent. Said documents are attached as **Exhibit 1** to Petitioner's instant petition contesting abandonment and towing/storage fees. However, upon presentment of the documents to Respondent, Respondent had changed its story and refused to release the vehicle to Petitioner, instead stating to Petitioner's representative that since a repossession order was presented, Petitioner would have to wait for an abandonment notice and then wait 21 days after the date of the notice.

5. As of July 11, 2017, Petitioner had not received any abandonment notice.

6. On July 11, 2017, I called Respondent and demanded return of the vehicle. An employee of Respondent informed me that an abandonment notice was sent out on June 28, 2017 and that Petitioner should receive it soon.

7. As of July 20, 2017, Petitioner still had not received an abandonment notice.

8. On July 20, 2017, I called Respondent and I demanded return of the vehicle and I stated that no notice had been received by Petitioner. An employee of Respondent informed me that Petitioner had to still wait for the abandonment notice.

9. On July 25, 2017, I again called Respondent and I demanded release of the vehicle and I stated that Petitioner would pay the towing and storage fees for release of the vehicle. Respondent refused and stated that Petitioner still had to wait for the abandonment notice.

10. On advice of counsel, Petitioner subsequently authorized counsel to file suit against Respondent in the 36th District Court. (Case No: 17-119492-GC, Hon. Izetta Bright). The case is pending.

11. On August 18, 2017, Respondent was served with the above-stated civil suit.

12. On or about September 9, 2017, Petitioner received an abandonment notice from the Secretary of State relating to the vehicle at issue. The notice is dated September 7, 2017 and is attached as **Exhibit 2** to Petitioner's instant petition contesting abandonment and towing/storage fees.

13. On September 13, 2017, I called Respondent in the afternoon and spoke with an employee of Respondent. I requested a written statement or invoice of the towing/storage costs and the employee refused.

# EXHIBIT 3

14. As of the date of this affidavit, Respondent has not provided Petitioner with any written demand, statement or invoice for the vehicle towing/storage charges and Respondent remains in custody of the vehicle.

Further deponent sayeth not.

Date: 9/20/2017

Emily Perry

Subscribed and sworn to before me on this 20th day of September, 2017.

Notary Public
State of Michigan, County of Oakland
My commission expires:



TIWANA A. BILBREY
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Aug 31, 2022
ACTING IN COUNTY OF Oakland

Page 3 of 3
*Brite Financial v. Bobby's Towing*
Affidavit of Petitioner

# EXHIBIT 3